THE STATE, DUFFORD, PROSECUTOR, v. JOHN A. DECUE, COLLECTOR OF TAXES IN THE TOWNSHIP OF NORTH WASHINGTON, MORRIS COUNTY.

1. The county Circuit Courts have not jurisdiction by *certiorari* over matters of taxation.
2. Their right to use this writ is confined to the one class of cases mentioned in the statute, *viz.*, to suits originating in the justices' courts.

In matter of taxation.

On case certified into this court by the Circuit Court of the county of Morris, for an advisory opinion upon the question, whether the Circuit Courts of this state have power to superintend and correct proceedings in matters of taxation within their respective counties, by means of the writ of *certiorari*.

The case was argued before the CHIEF JUSTICE, and Justices VREDENBURGH and VAN DYKE.

For plaintiff, *V. Dalrimple.*

For defendant, *J. Vanatta.*

The opinion of the court was delivered by
BEASLEY, CHIEF JUSTICE.    A *certiorari* was issued in this case out of the Circuit Court of the county of Morris, to remove an assessment of taxes made for school purposes, by the assessor in the township of Washington, in that county.   Upon the coming on of the argument before me at the circuit, entertaining a serious doubt with respect to the jurisdiction of that court in a matter of this kind, it was directed that the case should be certified to this court for its advisory opinion.

But a single question, therefore, at the present time is presented for decision, which is, whether the Circuit Courts of this State have power to superintend and correct the pro-

ceedings in matters of taxation within their respective counties, by means of the writ of *certiorari*.

It is not claimed that these local tribunals are possessed of this branch of jurisdiction, by force of anything in the act by which they are constituted. Their right is placed upon higher ground, for it is insisted that the authority in question is conferred upon them by the constitution of the state.

Section I. of article VI. of the constitution, enumerates the courts in which the judicial power shall reside, and among these mentions the Circuit Courts—and in clause 2 of section V. of the same article, proceeds to define the jurisdictional power of these courts. Its language is: "The Circuit Courts shall be held in every county of this state by one or more of the Justices of the Supreme Court, or a judge appointed for that purpose, and shall, in all cases within the county, except in those of a criminal nature, have common law jurisdiction concurrent with the Supreme Court; and any final judgment of a Circuit Court may be docketed in the Supreme Court, and shall operate as a judgment obtained in the Supreme Court from the time of such docketing. Final judgment in any Circuit Court may be brought by writ of error into the Supreme Court or directly into the Court of Errors and Appeals."

The interpretation put upon this clause is, that with respect to jurisdiction within the county the Supreme and Circuit Courts are co-equal. But that this construction cannot be accepted as correct, will, I think, manifestly appear if we read the clause itself in the light of cotemporaneous history, and with relation to the prior organization of the courts of this state.

At the time of the formation of the constitution, the principal courts possessing original common law jurisdiction, were the Supreme Court, the Common Pleas, and the county Circuit Courts. The first two of these were Provincial Courts, and when we would inquire into the extent and character of their judicial authority, we are obliged to revert to that distant era, for it is to the ordinance of Lord Cornbury, enacted in

1704, to which the origin of both these tribunals is to be traced. By this ordinance it was declared " that the several and respective Courts of Pleas hereby established, shall have power and jurisdiction to hear, try, and finally determine all actions or causes of actions, and all matters and things tryable at common law, of what nature or kind soever." And it is further provided, " that there shall be held and kept at the cities or towns of Perth Amboy and Burlington, alternately, a Supreme Court of Judicature, which Supreme Court is hereby fully empowered to have cognizance of pleas civil, criminal, and mixed, as fully and amply, to all intents and purposes whatsoever, as the Courts of Queen's Bench, Common Pleas, and Exchequer, within her majesties kingdom of England, &c." Vide *Provincial Courts of New Jersey, Appendix C., p.* 258, 260. In the year 1714, Governor Hunter and his council also passed an ordinance " for establishing courts of judicature in the state of New Jersey," and subsequently, from time to time, several regulations were enacted by the king and his council for a similar purpose; but these successive enactments, so far as they touched the two courts in question, were substantial transcripts of the provincial ordinance above cited, with the exception that the Court of Common Pleas was prohibited from trying causes wherein the title to lands was in any wise concerned. *Prov. Cts. of N. J., Appx. E., F. and G.;* 4 *Griff. L. Reg.* 1168, note 2 ; *Id.* 1174, note 1.

Such was and continued to be the judicial regimen in this state as long as it remained in the condition of a province. Nor was any change effected in it by the Revolution and the constitution of 1776. This instrument was silent on the subject of these two courts, but shortly afterwards, on the 2d of October, in the same year, the legislature enacted " that the several courts of law and equity of this state shall be confirmed and established, and continue to be held and established with the like powers under the present government, as they were held at and before the declaration of independence." *Pat. Laws* 38. And then, to complete this brief historical

outline, next in order came the act of the 14th of February, 1838, instituting the Circuit Courts of the counties and conferring upon them their jurisdiction in the following terms: " and which said Circuit Courts in every county in this state, in addition to the power and authority now possessed by the Circuit Courts of this state, shall be and are hereby constituted courts of original jurisdiction and of record, and be vested with and have the power and the authority incident to the courts of common law, except in cases of a criminal nature; and have power and authority and jurisdiction in like manner and to the like extent as the Courts of Common Pleas and Supreme Courts of this state now have to institute, hear, try, and determine all actions and causes, real, personal, and mixed." *Pamph. L.* 1838, *p.* 61.

This, then, was the disposition and organization of the judicial tribunals at the time of the formation of the constitution of 1844. At that epoch, the ordinary common law original jurisdiction of the Supreme Court was shared by the respective county Circuit Courts, and to a definite extent by the Courts of Common Pleas; but the appellate and extraordinary jurisdiction with which the Supreme Court, as the successor of the King's Bench, had been originally vested, remained centered still exclusively in that tribunal—with the single anomaly, that the act constituting the Circuit Courts had conferred upon them the power to review suits originating in the Justices' Courts, by the instrumentality of the writ of *certiorari.*

The question then arises, did the framers of the constitution of 1844, by the language above cited which establishes the county Circuit Courts as constitutional courts, intend to change, in any radical degree, this judicial system, or to alter, in any respect, the gradation of the several courts composing that system?

I think it plain that such was not the design. The language in the constitution in the clause above cited is not more general or comprehensive in its import than that used either in the ordinance of Lord Cornbury, or in the act of

1838, organizing the Circuit Courts. By the former the Court of Common Pleas is declared to " have power and jurisdiction to hear, try, and finally determine, all actions and causes of action, and all matters and things triable at common law, of what kind or nature soever ;" and by the latter the Circuit Courts of the county are clothed with authority in not less capacious nor essentially dissimilar terms. And yet, by the force of this rather indefinite language, it was never supposed that either the Common Pleas or the county circuits were possessed of any more than a concurrent common law jurisdiction with the Supreme Court, within the limits of their respective counties in the ordinary line of actions, *inter partes.* It is certain that no greater power than this was ever claimed for them. In a defined measure they each shared, practically, with the Supreme Court a portion of its ordinary jurisdiction—and this was all, for, so far as is known, no attempt was ever made to bring before either of these tribunals any matter which was not embraced within the limit of this power. Indeed the express authorization of the Circuit Courts to use, in an enumerated class of cases, the writ of *certiorari*, excludes, in a very conclusive manner, all claim to the exercise of analogous prerogatives, and likewise evinces that the several terms conferring authority upon those courts, did not impart to them anything more than a portion of what I have called the ordinary jurisdiction of the Supreme Court. I think, therefore, that it is clear that at the time the new constitution was framed, these general terms, so often used in conferring on the local courts a partial jurisdiction co-extensive with that of the Supreme Court, had acquired a definite and settled meaning, and that such meaning was, that the inferior courts should have a concurrent cognizance over actions arising within the county, in the usual course of law between parties. And in this sense, in my opinion, were the words used in the constitution of this state. And this construction seems to me much fortified when we remember, that the distinction between the ordinary and prerogative jurisdiction of the Supreme Court has always

been clearly and sharply defined. In England, the ordinary jurisdiction of the King's Bench was shared, in a great measure, by the Common Pleas, and in a lesser degree by some of the other courts. But the authority which was exercised by means of the various writs of *mandamus*, *quo warranto*, *certiorari*, and others of a similar character, belonged to this high tribunal alone; and the ancient books tell us that these writs themselves were called prerogative writs, because the power to award them was not delegated by the crown to the judges of the common bench or the ordinary judges between party and party, but was reserved for that court in which the sovereign was supposed to be personally present, and on the ground that such writs are of grace and favor, and are grantable at discretion upon probable cause shown, and are not demandable as of right under the clause of magna charta, by which the king is bound not to refuse or delay justice. It was thus the authority of this court was always held to be supereminent; its transcendent prerogatives were to keep all inferior jurisdictions within their bounds; to superintend all civil corporations; to command the performance of their duty by magistrates and others in all cases where there was no other specific remedy; and it originally possessed the exclusive power to protect the liberty of the subject by its summary interposition. It was also a court of appeal, into which could be removed, by writ of error, all determinations of the Court of Common Pleas and of all inferior courts of record in the kingdom. All these great powers were, by the ordinance of our first provincial governor, transferred to the Supreme Court, and were exclusively exercised by that tribunal from that time to the era of the new constitution; and it was these extraordinary powers which belonged to it as a Supreme Court, which were not, as I think, intended to be granted to the Circuit Courts by that instrument. To deposit this power in several hands would seem to be most unwise; for we are not to forget that it is by force of this prerogative power that a superintendency is exercised over many affairs in which the

people, not of a particular locality but of the state at large, have an interest; for it is by this means that the public finances, the militia system, the exercise of the right of suffrage, and other matters of ·similar political importance are regulated and protected. It is obviously important that such interest, should not be affected by adjudications possessed of a merely local authority, but that every judicial determination respecting them should be co-extensive in effect with the subject to be controlled, for in this manner only can uniformity be preserved in these affairs of such high public moment. The weight of this last consideration is also much increased by the circumstance that a judicial decision in some of the cases cognizable by means of the prerogative writs above mentioned, cannot be reviewed by writ of error or otherwise, but are absolutely final in their nature. Besides, it is obvious that the same course of reasoning which will clothe the county courts with jurisdiction in the class of cases above referred to, will also clothe them with appellate jurisdiction by writ of error to the Court of Common Pleas; for if concurrent jurisdiction with the Supreme Court implies and is equivalent to co-ordinate and co-extensive jurisdiction, these Circuit Courts cannot consistently be denied this power of review. The construction claimed is not admissible, as it would displace the due subordination of the several courts and disturb very injuriously, the harmony of the entire judicial system.

Neither do I perceive anything in clause 2d of section IV. of article VI. of the constitution* to which the court, on the argument, was referred, which would seem to jar with the view above expressed. That clause refers to the jurisdiction of the Orphans Court, and declares that none of its decrees shall be removed into the Supreme or Circuit Courts. From this language the inference was drawn that but for this express prohibition a decree of the Orphans Court could have been removed into the Circuit Court by *certiorari*, and that it thus appears that the right to issue such writs is inherent in such courts. But this conclusion is ill-founded. The ob-

* *Rev.*, p. 25.

ject of the provision was, to put a *constitutional* interdict on the exercise of this power of review over the decrees of the Orphans Court, both by the Supreme and Circuit Courts—the design being to prevent such jurisdiction being granted by legislative authority.

The conclusion, therefore, is, that the Circuit Court had not the power to issue the writ in question, and that court should be so advised.