## In re KENNETH WILLIAMS, an infant.

[Submitted June 28th, 1910.   Decided July 19th, 1910.]

1. In a suit by an orphanage to recover the possession of a child which had been given respondent on trial, evidence *held* to show that her financial circumstances were too precarious to warrant a decree giving the child into her permanent custody, but that it should be returned to the care of the orphanage.

2. An orphanage which has received a child under an agreement with its parent and undertaken the care of it, stands *in loco parentis*, and may bring suit for the recovery of the child where it has come into the possession of a third person.

3. Where an orphanage has received a child under an agreement with its parent and undertaken the care of it, its care must be exercised under the supervision of a competent court.

4. Where an orphanage had given a child to respondent on six months' trial, it could regain the child within that time subject to the approval of the court.

5. The chancery court takes cognizance of cases involving the custody of children legally domiciled within this state, both by virtue of its general jurisdiction, and under laws 1902 (*P. L. 1902 p. 259*), and by virtue of its general jurisdiction has the same authority and control over the care and custody of infants who are actually residents of this state as it has over those that are domiciled here.

6. *P. L. 1907 p. 390*, providing for the regulation of the importation of dependent children and imposing a penalty for violation thereof, has nothing to do with a judgment touching the custody of children in a contentious proceeding.

On application for custody of a child.

*Mr. Thomas L. Raymond* and *Mr. Henry W. Stiness* (of the Rhode Island bar), for the petitioner.

*Mr. Charles E. S. Simpson,* for the respondent.

HOWELL, V. C.

This is an application by St. Mary's Orphanage, a Rhode Island corporation, for the custody of Kenneth Williams, a child about six years of age, now in the keeping of the respondent,

Sara V. Murray, of East Orange, in this state. The child was born in Rhode Island, where its parents lived, in 1894. Soon after its birth the father deserted the wife and child; his whereabouts at the present time are unknown. The mother committed the child to the care of the orphanage on October 6th, 1905, by a document signed by her whereby she relinquished and surrendered the infant to the institution in consideration that it would provide him a home and education until he should arrive at the age of —— years, agreeably to its by-laws, promising not to interfere in the management or control of him in any way until that time. She agreed to pay to the orphanage the sum of $1.50 per week for each and every week that the child should remain at the institution, and that if at any time the weekly payments should remain due and unpaid for the space of thirty days, then she would relinquish and forever quit-claim to the institution all her right to the control of her child during his minority. The orphanage appears to have statutory authority for whatever it did concerning the child.

Nothing has been heard from the mother since September 24th, 1908. At that time she wrote a letter to the matron of the orphanage in which she stated that she did not think that she would ever be able to care for the child herself, and she hoped he would find some place where he could be cared for.

In the early part of 1910 the respondent came into communication with the officers of the institution, and an arrangement was made, with the authority of the directors, by which the infant was to be committed to her custody; and a direction was given to the matron by a writing which is in evidence, signed by Mrs. Foster, who was chairman of the committee on admissions and dismissals, to dismiss two boys, one of them being the infant in question, to the care and custody of the respondent, for six months on trial for adoption. This document was dated January 29th, 1910, and was delivered to the matron. I do not find any testimony going to show that it was ever exhibited to the respondent; but although the question of fact was much disputed at the hearing, I find enough evidence to convince me that the respondent knew, at the time the child was committed to her care and custody, that it was for a probationary period of

six months, and that she took him with that understanding. The child was actually delivered to the respondent at a hotel in New York by a Miss Mason, who had brought him there from Providence for the purpose. There is considerable discrepancy in the testimony as to whether Miss Mason delivered the child unconditionally or whether it was delivered for the probationary period. I find, however, that Miss Mason had no authority to make any agreement for the institution, and that the sum of her power was to deliver the child in accordance with the previous understanding between the respondent and Mrs. Foster. I therefore conclude that the child was delivered to the respondent on trial only, for the period of six months from the date of delivery. The petition praying for its return to the custody of the institution was filed within that period, so that it has the benefit, if benefit it be, of that fact.

[Here follows a discussion of the evidence, which is omitted at the request of the vice-chancellor.]

In this situation the court is called upon to deal with the permanent custody of this child, and is asked to award it to the respondent, with her purpose and intent to legally adopt it under the laws of this state, fully before the court. If the subject of this controversy were the only child in contemplation it might be very doubtful whether it would be to its interest to disturb its present custody, but when it is considered that the respondent has undertaken to care for, maintain, support and educate, and eventually adopt eight or ten almost helpless infants upon the precarious and unsubstantial basis on which this enterprise is founded, a different situation is presented. In determining what is best for the child in the long run all these elements must be carefully considered. The controversy now pending is perhaps the most important event that will happen in this child's life.

The award of the custody of this child to the respondent, and its adoption by her, would be practically the final and irrevocable disposition of it, for the reason that it appears to have been abandoned by both father and mother; its good or ill fortune during its childhood, and probably during the whole course of its life, will depend on the success of the respondent and her

husband in their benevolent and religious endeavors. This looks to me like a chance to which this child ought not to be subjected, and I am not minded to place its future at the risk of a failure of a scheme which appears to have such an uncertain footing.

Upon this ground alone I then conclude that the child should not remain with the respondent. I gladly acquit her of all the charges of immorality and other personal unfitness so unwarrantably made in the original petition. The embarrassment that must come from possible, if not probable, financial failure, is the only reason why the respondent and the child should be separated.

In addition to what has been said, it appears that the petitioner stands *in loco parentis* to the subject of this action. When the child was surrendered by its mother, it was upon the promise that it should be properly cared for. While an agreement between a parent and a third person as to the custody of a child would not be binding on the parent (*State* v. *Baldwin, 5 N. J. Eq (1 Halst. Ch.) 454; People* v. *Mercein, 3 Hill 399*) I venture the suggestion that such agreement would bind the other party, and while either the father or the mother might disregard the agreement made by the mother in this case, the petitioner cannot evade or avoid its responsibility thereunder. The agreement binds it and places it *in loco parentis* as against the world. It stands as a sort of guardian with a duty imposed upon it of supervising the care and custody of its *quasi* ward, but still subject to the paramount supervision of a competent court. These facts give to the petitioner a standing in court and confer on it rights which should be respected; at least, it is not an intruder and a stranger. Under the terms of the agreement between the parties hereto, it had the right, subject to the approval of the court, if such approval were sought, to resume the custody and possession of the infant, and again to take up its self-imposed duty.

The respondent questions the jurisdiction of the court to entertain the petition or to make any order thereon, upon the ground that the infant is legally domiciled in the State of Rhode Island, such being the domicile of its origin, and it not having yet attained to an age when it might have a domicile of choice. The

fact that the child is actually within the territorial jurisdiction of this court is lost sight of in this argument.

As to children who are legally domiciled here there is no doubt of the jurisdiction of this court over them. It takes cognizance of cases involving their custody either under the statute (*P. L. 1902 p. 259*) or by virtue of its general jurisdiction. *Baird* v. *Torrey, 19 N. J. Eq.* (*4 C. E. Gr.*) *481; Richards* v. *Collins, 45 N. J. Eq.* (*18 Stew.*) *283.* The statute above mentioned, by its terms, does not apply, but I see no reason in the nature of things why this court, by virtue of its general jurisdiction over infants, does not acquire the same authority and control over the care and custody of infants who are actually resident in this state, as it does over infants who are actually domiciled here. To hold otherwise would, to put an extreme case, permit designing and evil-minded persons to import infants into the state to become castaways and dependents. Proper superintendence must abide somewhere; the law has assigned it to this court.

I have not been able to find. any case in our reports in which there was a controversy over the custody of a child between parties who were strangers in blood to it; but in my opinion the fact that the child is actually here, and that grounds appear for a real controversy over its custody, are sufficient to justify the court in adjudicating upon the questions raised. In *Johnstone* v. *Beattie* (*1843*), *10 C. & F. 42*, the house of lords approved of the appointment by the court of chancery of England of a guardian for an infant who was domiciled in Scotland where all her property was. The judgment was strongly dissented from, but the prevailing opinion has been followed with little question. The real ground was that the infant was within the jurisdiction, and that was sufficient to give the court power to appoint a guardian.

It was held in *Re Barry, 61 N. J. Eq.* (*16 Dick.*) *135*, that this court had never assumed the authority to appoint guardians for infants. This duty is imposed upon the prerogative and orphans courts. The power seems always to have been exercised by the English chancery as part of its general supervision of the affairs of infants. This difference, however, does not militate against the argument deduced from the *Johnstone Case*, because the appointment of a guardian for a foreign infant carried with

it all the questions touching the custody of the ward. When, therefore, the court appointed a guardian, it was bound to hear and determine all controversies over the ward's custody. Both branches of the jurisdiction are derived from the same principle and stand on the same foundation.

*Dawson* v. *Jay (1854)*, *3 De G. M. & G. 764*, is another case in which the lord chancellor took jurisdiction, although eventually he declined to interfere. There the infant was the daughter of an Englishman who had removed to New York and had become a naturalized citizen of the United States. Her father and mother were dead; her property was in New York; she was taken to England by a paternal aunt, with whom she resided in England. A maternal aunt, who had been appointed guardian in New York, sought to have the infant delivered to her with a view to taking her back to America. The fact that the question of jurisdiction was not raised shows that it was not doubted. In *Hope* v. *Hope, 4 De G. M. & G. 328*, the lord chancellor says, speaking of the jurisdiction which is exercised over foreign children in England: "The reason that the jurisdiction exists over foreign children in this country is that foreign children, just like adults while they are in this country, are, to a certain extent, the subjects of the crown of England. The courts have decided that for this purpose they are, and I think on very good grounds." The same jurisdiction was declared in *Stuart* v. *Bute (1861)*, *9 H. L. Cas. 440*, in which Lord Campbell, then lord chancellor, who had dissented in *Johnstone* v. *Beattie, supra,* said that if there was a foreign child in England, with guardians duly appointed in the child's own country, the court of chancery might, without any previous inquiry, make an order for the appointment of English guardians, and quoting Lord Langdale, who concurred in the judgment of *Johnstone* v. *Beattie,* he says: "If it should unhappily become necessary to call upon the courts of the two countries to exercise their power, I know of nothing that would render it impracticable for the English court of chancery to order a guardian resident in England to deliver up the infant to the guardian resident in Scotland," showing that the house of lords considered the jurisdiction to be undoubted. In *Nugent* v. *Vetsera (1866)*, *2 L. R. Eq. Cas. 704*, Vice-Chancellor Wood says: "I hold the

court has power to appoint guardians, for the simple reason that it may well happen that foreign children may be found here who are not being looked after or cared for or the like, or who may even be placed in such a position that they are likely to be despoiled of their property and robbed by those who ought to protect them; they would come here for the protection which this court would afford them." *In re Willoughby, 30 C. D. 324,* an infant born in France was the daughter of a French woman, but was a British subject. The father died intestate and the mother thereupon by the French law was restored to her nationality and became legally entitled to the guardianship of the infant. Notwithstanding the non-residence of the infant and the fact that its property was all in France, the chancery division appointed a guardian on the ground that the infant was a British subject, although living in France, and this was affirmed by the court of appeals, a decision which carries the doctrine almost to the very verge.

In *Woodworth* v. *Spring, 4 Allen 321,* there was a controversy over an infant whose father and mother were both dead. The child had been brought from Illinois, the state of its domicile, to Massachusetts, with the consent of the guardian. The child lived with its aunt in the latter state, and she, without the knowledge of the Illinois guardian, procured herself to be appointed guardian in Massachusetts. The Illinois guardian sought his custody. Chief-Justice Bigelow says: "In determining the question of his legal custody in this commonwealth, he is therefore to be regarded as a foreign child who is lawfully within the jurisdiction of this state, having been brought within its limits, not forcibly or clandestinely, but with his own consent and with that of the petitioner, his duly-appointed guardian, under the laws of Illinois, who had the lawful custody of his person in that state, * * * he is now lawfully within the territory and under the jurisdiction of this commonwealth, and has a right to claim the protection and security which our law affords to all persons coming within its limits, irrespective of their origin or of the place where they may be legally domiciled. Every sovereignty exercises the right of determining the status or condition of persons found within its jurisdiction. The laws of a foreign state cannot be permitted

to intervene to affect the personal rights or privileges even of their own citizens, while they are residing in the territory and within the jurisdiction of an independent government. Effect may be given by way of comity to such laws by judicial tribunals of other states and territories, but, *ex proprio vigore,* they cannot have any extraterritorial force or operation. The question whether a person within the jurisdiction of a state can be removed therefrom depends not on the law of the place whence he came, or in which he may have his legal domicile, but on his rights and obligations as they are fixed and determined by the laws of the state or country in which he is found." There is much more in the opinion to the same effect.

The principle seems to be one of universal application, and, applying it to the case in hand, we must come to the conclusion that this court has jurisdiction to entertain applications touching the custody of foreign children who are within the territory of the state.

It was argued on behalf of the petitioner that "An act to regulate the importation of dependent children and providing a penalty for violation thereof," approved May 10th, 1907 (*P. L. 1907 p. 390*), was applicable to the case in hand, but I have not found it necessary to appeal to it for authority to advise a decree for custody. It does not deal with that subject. It may establish a public policy on the part of the state, but cannot be the basis of any judgment touching the custody of children in a contentious proceeding.

I therefore conclude that the child should be returned to the petitioner, and I will so advise.

If the details relating to the delivery of its custody to the petitioner's agent cannot be arranged by counsel, the time and manner of delivery will be settled by the decree.

MEMORANDUM ON APPLICATION TO SETTLE THE DECREE.

The proofs in this case were opened for the purpose of giving the respondent an opportunity to lay before the court a more particular statement of her income and the sources thereof. Further evidence was taken, and the same has been submitted to

the court, with fresh arguments on the whole case. This new evidence has not changed my conclusions with regard to the point on which the case was decided at the first hearing. I still think that the resources of the respondent and those of her husband also are too precarious and uncertain to justify this court in leaving the Williams boy in her custody with the added likelihood of his adoption. Mr. and Mrs. Murray happen at the present to be in receipt of an income of perhaps seven thousand five hundred dollars to eight thousand dollars. This, under ordinary circumstances, would be sufficient to justify the court in leaving the child in Mrs. Murray's custody. This income, however, is derived not from investments of funds, but is a sort of hand to mouth income derived from the exploitation of new views of psychotherapy, which seem to have originated with Mr. and Mrs. Murray. There seems to be no solid foundation for it and no certainty that it will last. The respondent is therefore conducting a private charity which appears to me to be in danger of being overloaded at the first approach of adverse fortune. It may be doubted whether this charity is of such a nature as places it under the visitatorial jurisdiction of the attorney-general. This officer may institute suits for the correction of abuses in public charities. There does not appear to be any case in which the court has acted upon a charity of this nature. Public charities are such as the court can see to the execution of, but how can this private charity of Mrs. Murray's be controlled or carried into execution, and in case of a collapse of the enterprise, who would be sufficiently interested to look after the welfare of the children who might thus be thrown upon the world without guardianship? The situation of the petitioner is entirely different. It is a public charity and is subject to state supervision. It has a foundation with an organization of people devoted to its interests and to the promotion of the welfare of the inmates. Besides it has been specially charged with the care and keeping and the nurturing and the oversight of the particular infant in question.

I will advise an order directing the delivery of the child to the petitioner.