ELIZABETH BORAWICK, PLAINTIFF-APPELLANT, v. JOSEPH BARBA, DEFENDANT-RESPONDENT.

Argued April 30, 1951—Decided June 18, 1951.

Dissenting Opinion July 2, 1951.

Mr. *Samuel D. Bozza* argued the cause for appellant (*Mr. James P. Lordi*, attorney).

Mr. *Morris Barr* argued the cause for respondent (*Mr. David E. Tiplitz*, attorney).

The opinion of the court was delivered by

CASE, J.  Plaintiff is the mother of a child born out of lawful wedlock.  She resides, with the child, in another state.  She filed her complaint in the Superior Court, Chancery Division, praying that the court adjudge the defendant to be the father of the child and direct him to pay to the plaintiff suitable sums of money for the care, maintenance and education of the child as well as the expenses which were incurred as a result of the pregnancy of the plaintiff and the subsequent birth of the child, together with loss of earnings and other expenses incidental thereto, and that plaintiff, as the mother, be granted the custody together with the care, education and maintenance of the child.  The Superior Court dismissed the complaint for lack of jurisdiction.  An appeal from the order thereon was taken to the Appellate Division and comes to us on our own motion.

Appellant argues that the Superior Court had jurisdiction because of the following statutory provisions, *R. S.* 9:16–2, –3, –4, and because of the constitutional provision, *Art. VI, sec. III, par.* 2, that "The Superior Court shall have original general jurisdiction throughout the State in all causes."

An understanding of the statutory references requires a study of their history.  The purpose of the old bastardy acts was to protect the public from becoming charged with the support of an illegitimate child.  Jurisdiction was lodged with the justices of the peace and the proceedings were prosecuted by the overseer of the poor.  The putative father was apprehended, security was required and appropriate orders were made against the father and the mother.  That, briefly, was the procedure set up by the "Act for the maintenance of bastard children," passed February 26, 1795.  *Pat.* 152. The substance of it, referred to with greater detail later herein, amplified to provide the lying-in expenses of the mother, an order of filiation against the father, a trial by jury if demanded and an appeal to the Sessions, was reenacted by the revision bearing the same title, passed March

27, 1874, *Rev.* 1877, *p.* 70. So, too, of the *Revision of* 1898 (found at *p.* 959 of the *Pamphlet Laws* of that year, and at *p.* 184 of the *Compiled Statutes*), with more particularity and with the proceedings set before a "magistrate," defined to include justices of the peace, judges of city criminal courts, police justices, recorders and all other officers having the powers of a committing magistrate. But the moving party was always the overseer of the poor. *Kaufman v. Smathers,* 111 *N. J. L.* 52 (*E. & A.* 1933). The *Revised Statutes of* 1937 assembled the provisions of the 1898 bastardy act as *Title* 9, *chapter* 17, *viz., R. S.* 9 :17–1, *et seq.,* and incorporated with them certain amendatory additions, such as transferring the function of an "overseer of the poor" to the "director of welfare" under the direction of the county welfare board in counties having such an officer and board. But the proceedings remained essentially as they had always been, namely, the means whereby the overseer of the poor, or a person occupying his relative position, could bring before the justice of the peace or other local magistrate the matter of an illegitimate child born or likely to be born so that the putative father might be bound to protect the public from the expense of the child's support.

The origin of *R. S.* 9 :16–2, –3, –4, upon which appellant relies, was *ch.* 153, *Pamph. Laws* 1929, "An Act concerning the support and education of children born out of wedlock." The statute did not go into a determination of paternity; but such a determination is a necessary preliminary to an order upon the father for support and is to be reached by a procedure correlated to that of present chapter 17—the former bastardy act. The 1929 statute provided that a child born out of wedlock was entitled to support and education from its father and mother to the same extent as if it had been born in lawful wedlock and that proceedings to enforce the statute could be maintained by one parent against the other or by the person having physical custody of the child, or, if the child was likely to become a public charge, that proceedings might be instituted by the overseer of the poor of the municipality

where the father and mother or either of them resided. It further provided that "For the purposes of this act jurisdiction is conferred upon the magistrates or courts now exercising jurisdiction in bastardy cases. The action herein given shall be deemed cumulative as to the remedies contained in the act entitled 'An act for the maintenance of bastard children' (Revision of 1898), approved June fourteenth, one thousand eight hundred ninety eight, and the acts amendatory thereof and supplemental thereto." Thus, the statute was an addition to the Bastardy Act and placed jurisdiction with the magistrates or courts having jurisdiction in bastardy cases; it was incorporated into the *Revised Statutes of* 1937 as *Title* 9, *chapter* 16, *sections* 2, 3 and 4, *viz., R. S.* 9 :16–2, –3, and –4; and the proceedings thereunder are cumulative to the Bastardy Act and are had before the magistrates or courts which exercise jurisdiction in the bastardy proceedings, namely (*R. S.* 9 :17–1), "justices of the peace, judges of city criminal courts, judges of the juvenile and domestic relations courts, police justices, recorders and all other officers having the powers of a committing magistrate," "except that justices of the peace in cities having a police, criminal or recorder's court shall not have jurisdiction of any such proceedings."

The decision of this court in *Kopak v. Polzer,* 4 *N. J.* 327 (1950), was premised on the fact that there had already been a bastardy proceeding instituted by the overseer of the poor, wherein the defendant had entered a plea of guilty. Paternity had been adjudicated. The points presented were: (1) the action was barred by order of the filiation court releasing the father from further support; (2) the action was by the mother in her own behalf and not for the child and did not present other statutory requisites; (3) a ruling on evidence. Jurisdiction of the criminal judicial district court to entertain a proceeding to compel an adjudged father to render support was not raised, was not considered and was not passed upon. The *dictum* in the opinion of the Appellate Division, 5 *N. J. Super.* 114 (*App. Div.* 1949), that the

Constitution gave a concurrent jurisdiction to the Superior Court was not pertinent to the decision and was not considered here. We discover no authority for a finding of filiation elsewhere than in the bastardy courts.

It follows that jurisdiction does not lie in the Superior Court and did not lie in any of those courts whose jurisdictions have been taken over by the Superior Court.

*R. S.* 9:16-1 is placed by the *Revised Statutes of 1937* in the same chapter with and immediately preceding, both in physical position and in numerical classification, sections -2, -3 and -4, which we have just been considering, but it is not connected with them historically, in subject matter or in jurisdiction. It provides that the mother of an illegitimate child shall have the exclusive right to its custody and that the putative father shall have no right of custody, control or access to the child without the mother's consent; but that, if the mother is unfit, the Court of Chancery, or any other court which may have jurisdiction in the premises, may make any order touching the custody or control of the child which might theretofore have been made and that the "section is intended to be declaratory of the existing law." That section was a reenactment of *ch.* 331, *Pamph. Laws* 1913, which in turn was a supplement to *ch.* 92, *Pamph. Laws* 1902, entitled "An Act concerning minors, their adoption, custody and maintenance (Revision of 1902)." The last-named statute, in section 1, provides for proceeding by petition in the Orphans' Court; in section 6 for jurisdiction, in certain aspects, in the Court of Chancery; and in section 14 for jurisdiction, in certain other aspects, in the Chancellor or a Supreme Court Justice; but neither the 1902 statute nor the 1913 statute, with which, as the predecessor of *R. S.* 9:16-1, we are immediately concerned, furnishes any authority for a proceeding to determine paternity or to give other relief in illegitimacy. Custody, although prayed in the complaint, is not a real issue. Plaintiff has the custody, and no one disputes her right to it or the propriety of her having it.

Since this is not a proceeding in strict bastardy we have passed over the facts that neither the mother nor her child has any settlement in this State and is not shown to be likely to become public charges here, and that no local authority burdened with the care of the poor is made a party.

Before discussing the effect of the express words of the Constitution we shall explore the possibility of an original jurisdiction in the Superior Court acquired from a superseded court to whose powers it is the successor. The only court through whose powers such an inherited jurisdiction could come would be the former Supreme Court. Article XXII of the 1776 Constitution provided: "The common law of England, as well as so much of the statute law, as have been heretofore practiced in this Colony, shall still remain in force, until they shall be altered by a future law of the Legislature * * *." Article XXI of the same document provided that "all the laws of this Province, contained in the edition lately published by Mr. Allinson, shall be and remain in full force, until altered by the Legislature of this Colony * * *." That Constitution also, by inference rather than by direct statement, provided for the continuance of the Supreme Court; and the Legislature, three months later (October 2, 1776), enacted that "the several courts of law and equity of this State shall be confirmed and established, and continued to be held with like powers under the present government, as they were held at and before the declaration of independency, lately made by the honorable the continental congress." *Pat.* 38. It has been held that by the conjunction of the ordinance of Lord Cornbury, enacted in 1704, other ordinances including the ordinance of 1714 passed by Governor Hunter and his Council, the 1776 Constitution, the statute *supra* of October 2, 1776, and the Constitution of 1844, the former Supreme Court became vested with the ordinary common law original jurisdiction of the Court of King's Bench, shared to some extent by the county circuit courts and the courts of common pleas, and that it became more exclusively vested with the appellate and extraordinary

jurisdiction of that English court. *State, Dufford, Prosecutor, v. Decue,* 31 *N. J. L.* 302 (*Sup. Ct.* 1865); *Hedden v. Hand,* 90 *N. J. Eq.* 583 (*E. & A.* 1919); *State v. Longo,* 136 *N. J. L.* 589, 594 (*E. & A.* 1947).

Distinction must be made between that character of bastardy proceedings which had to do with the determination of legitimacy or illegitimacy and the effect thereof upon the rights of inheritance and upon family position generally and that procedure which was directed toward the support of a bastard at public expense. The latter is and has always been a part of the law concerning the settlement and support of the poor. *Cf. Regina v. Cambridgeshire,* 7 *A. & E.* 480. Notwithstanding a *dictum* to the contrary in *Schomp v. Tompkins,* 46 *N. J. L.* 608 (*E. & A.* 1884), there was no obligation on the putative father to support his illegitimate child at common law, *Commonwealth v. Dornes,* 132 *N. E.* 363 (*Sup. Jud. Ct. Mass.* 1921), *Kordoski v. Belanger,* 160 *A.* 205 (*Sup. Ct. R. I.* 1932), and there is none today except where, as here, the common law has been changed by statute, *People ex rel. Lawlon v. Snell,* 216 *N. Y.* 527, 111 *N. E.* 50 (*Ct. of Appeals N. Y.* 1916), *Murrell v. Industrial Commission,* 291 *Ill.* 334, 126 *N. E.* 189 (*Sup. Ct. Ill.* 1920). We are not concerned with actions on contract, either express or implied.

Our colonial statute, XIV *Geo.* III. *A. D.* 1774, printed as *ch.* DXC of *Allinson* (*page* 403) and therefore within the statutes specified for retention in the 1776 Constitution, was entitled "An Act for the Settlement and Relief of the Poor" and in paragraph 4 provided that "Whereas single Women with Child often remove from the Places of their Settlement, and are delivered of Bastard Children in distant Cities, Townships or Precincts, whereby such Cities, Townships or Precincts are unjustly liable to, and often made chargeable with the Support of such Bastard Children, Be It Therefore Enacted by the Authority aforesaid, That all Bastard Children shall hereafter be deemed, esteemed and taken to be settled in the Place of the last legal Settlement of the

Mother of such Bastard Child or Children, any Law, Usage or Custom to the contrary notwithstanding." The same statute contained, *inter alia*, various provisions for determining the legal settlements of poor persons, for visiting the expense of the maintenance upon those who were properly chargeable therewith, for protecting the municipality from that expense, and for raising public funds for the relief of the poor. Proceedings were at the instance of the overseer of the poor, before justices of the peace, with appeal to the *Court of Quarter Sessions* which (*sec.* 27) was directed to correct any defects of form and after so amending "to proceed to hear and determine the same in the usual Manner," with provision for removal at once to the Supreme Court with "equal authority." Let it be observed, however, that there was no provision, and no legal machinery, for the beginning of the matter except at the instance of the overseer of the poor and before the justices of the peace. The statute further provided (sec. 32) that all former acts and laws of the colony relating to the settlement and relief of the poor, with some exceptions which do not bear upon our question, were thereby repealed. That statute, therefore, became the effective and comprehensive law on the subject matter.

The detail with which the enactment was prepared justifies the conclusion that such of the statute law of England as bore upon the care of the poor and the charging the expense thereof upon those who should meet that expense and was not embraced within the provisions of the act was a deliberate omission and not to be counted as practiced in the colony. Therefore, we think that such a statute as VI *Geo.* II. *ch.* XXXI, *Vol.* 6 *Statutes at Large p.* 142, may not be regarded as in force here at the time of the separation from England. But if it be otherwise, appellant's case does not profit because the jurisdiction and procedure set up by that statute conform to the usual scheme, namely, the birth or imminent birth of a bastard child likely to be chargeable to the parish, a charge against the putative father, a proceeding

before a justice of the peace by an overseer of the poor or another in his place, an arrest, an indemnification or a recognizance to appear at the next quarter sessions, etc. Beyond that, while there are reports of decisions in the King's Bench of England in bastardy cases where the Crown appears as prosecutor, it is not shown that the cases were instituted there in relief of municipalities in their care of the poor or did not go up by writ of, or in the nature of, *certiorari*. We find no reason to doubt that the ancient practice in England was grounded in statutory provisions which placed jurisdiction in the justices of the peace, with appeal to the Sessions. *Cf. Dunn v. Overseer, 32 N. J. L. 275 (Sup. Ct. 1867); Petersdorff's Abridgement, Vol. IV, Title Bastard, sec. IV (B); Burn's Justice (6th ed.), Title, Bastards.*

To give greater detail of the act of February 26, 1795, *supra (Pat. 152)*: it provided that "for the better relief of every township" any two justices of the peace of any county "take order" for the keeping of a bastard child by charging the mother, or reputed father, with the payment of sustenance moneys, and upon failure to comply to commit to a house of correction, or the common gaol, there to remain "except he or she shall put in sufficient surety to perform the said order, or else personally to appear at the next court of general quarter sessions, or of general sessions of the peace, * * * and also, to abide such order" as should there be made; and also that if a woman were delivered of, or declared herself to be with, child, a bastard, and should, on oath before one or more justices of the peace charge any person with having begotten the child, it was lawful for the justice or justices, upon application of the overseer of the poor, to issue a warrant for the arrest of the person so charged and to commit him to gaol unless he gave security to indemnify the township or enter into recognizance with sufficient surety to appear at the next court of quarter sessions, or of the general sessions of the peace, etc.

Fundamentally, particularly in point of jurisdiction, both original and appeal, our statute of February 26, 1795, is

comparable to the pertinent poor and bastardy laws of England as outlined by the Earl of Halsbury in his *Laws of England* (1st ed.), vol. 2, at *page* 443, *et seq.* And again, fundamentally, and with particular regard for jurisdiction, our present statute, already mentioned, bears close resemblance to the 1795 statute; the putative father is arrested at the instance of the overseer of the poor, is taken before a magistrate and gives bond for appearance, the magistrate examines (with a jury trial if demanded) touching paternity; if the decision is adverse to the putative father, there is an appeal by him to the quarter sessions, with a trial *de novo*.

To the extent that *R. S.* 9:16–3 authorizes an action by the overseer of the poor to compel the parents, one or both of them, to support and educate, under the preceding section –2, an illegitimate child, likely to become a public charge, it differs only in degree from the ancient bastardy proceeding. To the extent that it gives one parent of an illegitimate child a suit against the other by civil action between parties to support and educate the child, it provides a new obligation and a new statutory action (*Kaufman v. Smathers, supra*) which were without prototype prior to the Revolution or prior to the 1844 Constitution and consequently were not a part of the vested original jurisdiction of the Supreme Court. *Public Service Gas Co. v. Board of Public Utility Commissioners*, 84 *N. J. L.* 463 (*Sup. Ct.* 1913), affirmed 87 *N. J. L.* 581 and 597 (*E. & A.* 1914 and 1915); *State v. Taylor*, 68 *N. J. L.* 276, 278 (*E. & A.* 1902). The superintendency by the Supreme Court over bastardy proceedings and settlement proceedings in general, before justices of the peace and the Sessions, was exercised by writ of *certiorari.* *Cf. Overseer of the Poor v. Eason*, 92 *N. J. L.* 199 (*E. & A.* 1918); *Hildreth v. Overseers*, 13 *N. J. L.* 5 (*Sup. Ct.* 1831); *Dunn v. Overseer of the Poor, supra; Hurff v. Overseer*, 38 *N. J. L.* 287 (*Sup. Ct.* 1876); *Tewksbury v. Branchburg*, 44 *N. J. L.* 595 (*Sup. Ct.* 1882); *Schomp v. Tompkins, supra.* Although the appeal was from the justices to the Sessions, the

proceeding was civil and not criminal. *Overseer v. Eason, supra; Calaway v. Belleville,* 116 *N. J. L.* 377 *(Sup. Ct.* 1936).

The proceedings and jurisdiction under our extant statute follow the ancient precedents. There never was a practice by which a bastardy proceeding was instituted in the former Supreme Court, and we discover no jurisdiction by which such a practice could have arisen. Consequently, there is no inherited jurisdiction in the Superior Court.

The 1947 Constitution, *Article VI, sec. III, par.* 2, provides: "The Superior Court shall have original general jurisdiction throughout the State in all causes"; and upon that authority appellant seems to argue that every imaginable litigation, whatever its nature, however slight its importance and regardless of its historical background, may be initiated in the Superior Court. If this reasoning be sound, then not only bastardy cases but violations of the Disorderly Persons Act, infractions against municipal ordinances, all of the daily grind of the magistrates' courts, become eligible for institution in the Superior Court, and no matter of rule can stem the flow because the authority lies in the Constitution and is untrammeled. The Superior Court is not geared to such a practice and would not be able, physically, to assume it without a radical overturn in rules, manpower and court facilities. Because, if original jurisdiction is to be assumed in all cases, then, it seems, equipment for assuming jurisdiction must be supplied—local courtrooms, judges, clerks, dockets, practically a duplication, if not an absorption, of the entire inferior court system. The possibility of such a contingency brings a sense of shock followed by deep concern, and we believe that those sensations would be quickly shared by the bar, the bench, litigants and the taxpaying public if the suggested practice were imminent and the present inferior courts were to be paralleled by a Superior Court system. It is true that, literally, the words of the Constitution are capable of such a meaning; but we believe that the application of familiar rules leads directly away from that construction.

It is first to be observed that an interpretation which leads to an absurdity presents a *prima facie* doubt whether the interpretation is a sound exposition of the true meaning; and it can hardly be gainsaid that so great a jurisdictional upheaval as would follow the inauguration of the suggested practice, as against the facilities in operation from time immemorial, revamped and rebuilt at the suggestion of the Constitutional Convention, for handling minor local matters in courts not of record and of what might be termed a neighborhood jurisdiction, presents a prospect so confusing, so unnecessary, so expensive and so contrary to expectation as to be absurd. Let us take, for instance, the very character of litigation now before us, namely, proceedings in bastardy. Since our first statute, *supra*, passed in 1795, the jurisdiction has been exclusively in justices of the peace or in such magistrates as, with changing conditions, have succeeded to their authority. How strange that, without discussion, debate, or expression of dissatisfaction, that jurisdiction should suddenly be found to have been, at least coordinately, lodged elsewhere! And this suggests another cardinal rule for use in construing constitutions as well as statutes, the ascertainment of the mischief toward which a change was to be applied and a study of the remedy pursued.

A subject of spirited discussion, both in and out of the Constitutional Convention and long before the Convention came into existence, was the jurisdiction and makeup of the great trial courts; fundamentally, whether the courts of law and equity should be maintained separately as theretofore as two systems or should be combined into one court whose redress could be had whether in nature equitable or legal. A clear statement of that objective appears in *Article VI, sec. III, par.* 4—the second paragraph following the paragraph in controversy—as follows:

"Subject to rules of the Supreme Court, the Law Division and the Chancery Division shall each exercise the powers and functions of the other division when the ends of justice so require, and legal and equitable relief shall be granted in any cause so that all matters in controversy between the parties may be completely determined."

When the consensus of opinion in the Convention moved toward a merger into one court, a secondary question arose, namely, whether the Prerogative Court jurisdiction and the criminal jurisdiction should be withheld from the new general court so to be formed. After warmth of argument on both sides the issue was settled by setting up a single court, the Superior Court, with the direction that it should have original jurisdiction in all cases. There had been no controversy, and so far as disclosed there had been no issue, upon whether the inferior courts, at what might be termed the ground level, should be merged into the general court system or should share their jurisdiction with that system. The public question of original jurisdiction, widely discussed, had relation to breadth, and not depth, of jurisdiction. We have been shown no record or even an indication of a purpose to absorb the jurisdiction peculiar to the magistrates' courts into the Superior Court system or to cause that jurisdiction to be shared with the Superior Court. That such was not the intention of the Constitutional Convention may, to some extent, be read in the effort of the Convention, by extra-constitutional methods, to press the Legislature toward reorganizing and reestablishing the inferior court system so that it would be better qualified for its work when the Constitution, on September 15, 1948, should become effective. The Convention passed this resolution:

"Now Therefore be it Resolved:

(1) That the Legislature is hereby memorialized to consider the entire inferior court system of this State and to take such action as may be deemed necessary to establish a modern and efficient inferior court system to be presided over by qualified persons and to become effective if at all possible, by September 15, 1948, the date that the Judicial Article adopted by this Convention is to become effective.

(2) That the Legislature consider the enactment of legislation to provide that all judges of the inferior courts receive reasonable fixed compensation which shall have no relation to fees received.

(3) The Secretary of this Convention is hereby directed to transmit a duly authenticated copy of this resolution to the Governor forthwith, and to each house of the Legislature at the opening of

In accordance with that mandate the Legislature passed a series of statutes, *chapters* 264, 384 *and* 394, *P. L.* 1948, (*R. S.* 2:8A–1, *et seq.* and *R. S.* 2:8–37.1, *et seq.*), reconstructing and revamping the entire inferior court system to coordinate with the constitutional courts. It is incomprehensible that the Convention should lead, we may truthfully say force, the Legislature into that course of action if it were the intention to duplicate the legislative courts with a constitutional court system.

The precise wording of present *Article VI, sec. III, par.* 2, "The Superior Court shall have original general jurisdiction throughout the State in all causes," appeared in the 1942 draft as *Article V, sec. III, par.* 1. It is sufficiently clear from the various parts of the Judicial Article and of the schedule that the purpose there was to leave to the Legislature full control of the inferior court system and of the jurisdiction thereof within the limits then existing. The 1942 draft was followed by the 1944 draft submitted that year to the electorate and defeated. That document also, *Article V, sec. III, par.* 2, contained the same language about the original jurisdiction of the inferior courts and the provisions otherwise in the respects mentioned above were not sufficiently different for discussion.

With that history the clause came before the Judiciary Committee of the 1947 Convention. That committee reported to the Convention a draft which read as follows: "The General Court (afterwards changed to Superior Court) shall have original general jurisdiction throughout the State in all causes, *excluding, unless otherwise provided by law, probate and criminal causes.*" We have emphasized the words which became the subject of debate and discussion by the Convention and which, it will be observed, did not extend to the inferior courts. When the draft was before the Convention, it was moved on behalf of a majority of the Judiciary Committee that this change be effected: "The Superior

Court is to have general jurisdiction throughout the State in all causes, *without any exclusion." Convention Proceedings Vol.* 1, *p.* 462. Again we have given emphasis to focus attention upon the corresponding phrase of the paragraph as reported to the Convention. The essence of the matter was stated in the ensuing debate by one of the delegates when he recited the recommendations of the committee of the State Bar Association that "there should be one great state-wide court of original and intermediate appellate jurisdiction, exercising jurisdiction now vested by the present Constitution in the Supreme Court, the Court of Chancery, and the Prerogative Court, and sitting in a Chancery Division and a Law Division * . * * but with power to do full justice in any one cause," and when he commented thereon: "That is accomplished * * *." *Convention Proceedings Vol.* 1, *p.* 511. In other words, the speaker was advocating the adoption of the section in its proposed form, stating that the purpose of it was to give the broad original jurisdiction theretofore exercised by the Supreme Court, the Court of Chancery and the Prerogative Court, and that the proposed paragraph accomplished that purpose. The sponsor of the amendment which, upon adoption, left the reading as it now is explained that the purpose was "primarily to take care of the occasional cases in which the state-wide General Court exercises criminal jurisdiction—for example, charging the grand jury and other related matters—and also to take care of occasional cases where probate jurisdiction is exercised in the General Court." *Convention Proceedings Vol.* 1, *p.* 546. It is not believable that a proposed amendment intended to extend the court's jurisdiction throughout the jurisdiction of the inferior courts would be thus explained on the floor of the Convention. The purpose that the inferior courts should continue as theretofore, without constitutional addition to or subtraction from their jurisdictions, either directly or by the indirect method of giving the Superior Court a greater participation in their jurisdictions than the predecessor courts

had possessed, is manifested in varying degrees by other paragraphs of the Constitution. *Article VI, sec. I, par.* 1, without indicating any constitutional change in the absolute or relative jurisdiction of the inferior courts, provides:

> "The judicial power shall be vested in a Supreme Court, a Superior Court, County Courts and inferior courts of limited jurisdiction. The inferior courts and their jurisdiction may from time to time be established, altered or abolished by law."

*Article XI, sec. IV, par.* 3, provides for the transfer of jurisdiction from the superseded courts without mentioning any weakening transfer or sharing of the jurisdiction of the inferior courts:

> "The Court of Errors and Appeals, the present Supreme Court, the Court of Chancery, the Prerogative Court and the Circuit Courts shall be abolished when the Judicial Article of this Constitution takes effect; and all their jurisdiction, functions, powers and duties shall be transferred to and divided between the new Supreme Court and the Superior Court according as jurisdiction is vested in each of them under this Constitution."

And *Article XI, sec. IV, par.* 4, provides for a continuance of the inferior courts "as if this Constitution had not been adopted":

> "Except as otherwise provided in this Constitution and until otherwise provided by law, all courts now existing in this State, other than those abolished in paragraph 3 hereof, shall continue as if this Constitution had not been adopted * * *."

It could not be said with accuracy that the inferior courts would continue as theretofore if it was proposed to deplete their business by placing like jurisdiction in a court of higher rating.

■■ We believe that the meaning and purpose of the constitutional paragraph is thus clearly demonstrated without further comment by us and that they had no relation to the inferior courts. We are left without doubt that in

adopting *Article VI, sec. III, par.* 2 neither the framers of the Constitution nor the voters who adopted it at the polls had any thought of extending the original jurisdiction of the Superior Court into the jurisdiction of the inferior courts except as the courts to which it is the successor had such jurisdiction and except also such original jurisdiction as its Appellate Division is given by *Article VI, sec. V, par.* 3, necessary to the complete determination of any cause on review; and that the Superior Court has not, and any court to whose power it succeeds had not, original jurisdiction in bastardy cases arising under chapter 17 of the *Revised Statutes* or in other cases arising under *R. S.* 9:16–2, –3, –4.

For the reasons stated, we conclude that the Superior Court has no jurisdiction over the subject matter of the complaint and that the judgment of dismissal should be affirmed.

HEHER, J. (dissenting). There can be no doubt that the former Court of Chancery had jurisdiction of the care and custody of illegitimates, and that this jurisdiction now rests in the Superior Court under the Constitution of 1947. This has been a function of Chancery from the earliest time. The general jurisdiction of Chancery over the persons and estates of infants, for the protection of both, "is supposed to have originated in the prerogative of the Crown, arising from its general duty as *parens patriae* to protect persons who have no other rightful protector. But partaking, says Story, as the prerogative does, more of the nature of a judicial administration of rights and duties in *foro conscientiae* than of a strict executive authority, it was very naturally exercised by the court of chancery as a branch of its original general jurisdiction. 'Accordingly,' he adds, 'the doctrine now commonly maintained is, that the general superintendence and protective jurisdiction of the court of chancery over the persons and property of infants is a delegation of the rights and duty of the Crown; that it belonged to that court and was exercised by it from its first establishment; and that this general jurisdiction was not even suspended by the Statute

of Henry VIII, erecting the court of wards and liveries.' The jurisdiction possessed by the English courts of chancery from this supposed delegation of the authority of the Crown as *parens patriae* is more frequently exercised in this country by the courts of the States than by the courts of the United States. It is the state and not the Federal Government, except in the territories and the District of Columbia, which stands, with reference to the persons and property of infants, in the situation of *parens patriae*. Accordingly provision is made by law in all the States for the appointment of such guardians, whose duties and powers are carefully defined." *New York Life Insurance Co. v. Bangs,* 103 *U. S.* 435, 26 *L. Ed.* 580 (1880). See, also, *Dexter v. Hall,* 15 *Wall.* 9, 21 *L. Ed.* 73 (1873).

This conception of equity's inherent original jurisdiction, as a part of its general jurisprudence, over the persons and estates of infants has general acceptance. While this jurisdiction may, "in its very inception, have belonged to the king as a part of his executive power as *parens patriae* to protect his subjects, and may by him have been transferred to the court of chancery," it is "firmly established as a judicial function of the court; it does not belong to the chancellor alone as the personal delegate and representative of the crown; it is exercised by all the judges composing the court of chancery, in the same manner, and governed by the same regulations, as all other confessedly judicial functions." *Pomeroy's Equity Jurisprudence (5th ed.), section* 1304. It has been suggested that by the ordinance of March 28, 1770, the governor of the Province of New Jersey "was left with all the jurisdiction held by the English Chancellor as a judicial officer as distinguished from his power as a minister of the king, or representing the king as *parens patriae,*" and that the original jurisdiction of the Court of Chancery did not include "the care of property of infants," a subject which "belonged to the Chancellor in England as *parens patriae* rather than as a court, and was conferred upon the Chancellor of New Jersey by statute." *Keasbey's Courts &*

*Lawyers of New Jersey, vol. 2, pp.* 505, 508. But be that as it may, it was long recognized that the old Court of Chancery had general jurisdiction over the care and custody of infants domiciled or actually resident in New Jersey. Chancery had the beneficent prerogative of the care and protection of infants because of their incapacity for self-protection, due to their tender years. *The State, Baird, pros. v. Baird & Torrey,* 19 *N. J. Eq.* 481 (*E. & A.* 1868); *Richards v. Collins,* 45 *N. J. Eq.* 283 (*E. & A.* 1889); *Ex parte Hoines* (*N. J. Ch.*) 112 *A.* 613 (1920); *In re Williams,* 77 *N. J. Eq.* 478 (*Ch.* 1910). In the *Hoines* case, Vice-Chancellor Stevenson found that the control of infants was a part of the original general jurisdiction of the Court of Chancery, and that "while of course laws in regard to infants may be made and changed from time to time, the jurisdiction of the Court of Chancery to enforce those laws cannot be impaired by legislative enactment." The jurisdiction of the state "to regulate the custody of infants found within its territory does not depend upon the domicile of the parents. It has its origin in the protection that is due to the incompetent or helpless. * * * For this, the residence of the child suffices, though the domicile be elsewhere." *Finlay v. Finlay,* 240 *N. Y.* 429, 148 *N. E.* 624 (1925).

At common law, an illegitimate is deemed *nullus filius* with few civil rights or privileges. He has no inheritable blood; but he has the right of property. He can have no heirs except of his own body; and if he left no lineal descendants, his property is escheated. *Gaines v. Hennen,* 24 *How.* 553, 16 *L. Ed.* 770 (1860); *Brewer v. Blougher,* 14 *Pet.* 178, 10 *L. Ed.* 408 (1840); *Hardesty v. Mitchell,* 302 *Ill.* 369, 134 *N. E.* 745, 24 *A. L. R.* 565 (1922); *Wilkinson v. Adam,* 1 *Ves. & B.* 422, 35 *Eng. Rul. Cas.* 506, affirmed, 12 *Price,* 470, 147 *Eng. Reprint* 780; 1 *Blackstone's Com.* 459; 2 *Id.* 247. The acquired rights of an illegitimate have the protection of the common law; and Chancery has the same inherent jurisdiction over dependent illegitimates within the State, for their care and custody and general pro-

tection, as it has of legitimate children. *R. S.* 9:16–1 had its origin in c. 331 of the Session Laws of 1913 (*Pamph. L. p.* 733), which recognized the preexisting jurisdiction of the Court of Chancery over the care and custody of illegitimates. This act was a supplement to the act relating to "minors, their adoption, custody and maintenance"; and it was stated to be "declaratory of the existing law upon this subject."

There is an obvious interdependency between the care and custody and the support and education of infants. In most cases, the exercise of the judicial function in respect of care and custody necessarily involves the provision of support and education. The authors of the statutory revision of 1937 were indubitably guided by this consideration. *R. S.* 9:16–1, –2, –3 and –4 were grouped as chapter 16 of Title 9 relating to children, under the heading "Custody and Support." Whatever the jurisdictional shortcomings prior to the adoption of the Constitution of 1947, Article VI, section 3, paragraph 2 of that instrument vested in the Superior Court "original general jurisdiction throughout the State in all causes," and thereby in explicit terms conferred upon the Superior Court jurisdiction of the entire subject here involved. *R. S.* 9:16–4 provides that the remedy given by sections 9:16–2 and 9:16–3 "shall be deemed cumulative as to remedies contained" in *R. S.* 9:17–1, *et seq.*, commonly known as the Bastardy Act.

I would suggest that the limitations put upon this jurisdictional grant by my brethren are at variance with the constitutional design to lodge complete general jurisdiction in the Superior Court, and thus to avoid the jurisdictional limitations and conflicts of the old constitutional system that made for inefficiency and delay in the administration of justice. The history of the cited constitutional provision reveals a final draft intentionally free of all exceptions. The conceded inclusion of criminal jurisdiction in the Superior Court is an even more radical innovation. Yet there has been no suggestion that the whole of this jurisdiction be exercised by the Superior Court. The regulation of the exercise of

concurrent jurisdiction is largely a matter of practical administration.

It is to be borne in mind that the petition here invoked the unquestionable general jurisdiction of the Superior Court over the custody of illegitimates. While the petition alleges that the child was born in Baltimore, Maryland, it was asserted on the oral argument that the mother and child are domiciled in New Jersey. The application of the statute to the particular circumstances is not an appropriate subject of inquiry at this stage of the proceedings. The decision turns upon a question of basic jurisdiction under the Constitution.

I would reverse the judgment.

Mr. Justice BURLING joins in this opinion.

*For affirmance*—Chief Justice VANDERBILT and Justices CASE, OLIPHANT, WACHENFELD and ACKERSON—5.

*For reversal*—Justices HEHER and BURLING—2.