28 N.J. Super. 391 (1953)
101 A.2d 44
GLORIA HALL, PLAINTIFF-RESPONDENT,
v.
RALPH CENTOLANZA, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 16, 1953.
Decided November 30, 1953.
*393 Before Judges EASTWOOD, JAYNE and FRANCIS.
Mr. William Bruder argued the cause for the appellant (Mr. Marcus I. Blum, of counsel; Mr. H. Harding Brown, on the brief).
No appearance for the respondent.
The opinion of the court was delivered by FRANCIS, J.A.D.
In a proceeding brought in the Middlesex County Juvenile and Domestic Relations Court, respondent claimed that appellant Centolanza was the father of her illegitimate child and sought support for him. A jury trial was held on the issue of paternity and a verdict was returned adjudging appellant to be the father. Thereafter an order was entered requiring him to pay $8 weekly for the support of the child. The bond on the order of filiation indicates that the payments were to be made to the mother through the court. Centolanza appeals, asserting (1) the trial court had no jurisdiction since the proceeding was brought by the mother and not by the overseer of the poor or a duly authorized representative of the State Board of Child Welfare, as required by R.S. 9:17-2, and (2) because *394 the trial court committed error in permitting the mother to testify as to the resemblance between the child and the putative father.
The jurisdictional problem is not without difficulty. However, in our judgment it must be resolved adversely to appellant.
The common law imposed no obligation on a father to support his illegitimate child and no such obligation would exist today were it not for R.S. 9:17-1 et seq., and R.S. 9:16-1 et seq. Borawick v. Barba, 7 N.J. 393 (1951).
Under R.S. 9:17-2, if it appears to the appropriate overseer of the poor, or to a duly authorized representative of the State Board of Child Welfare, that an illegitimate child is or is likely to become a public charge, he may institute proceedings to determine the paternity of the alleged father and to require him to support the child. This legislation has a long history dating back to 1795. (Borawick v. Barba, supra.)
Prior to 1929 no one but the overseer of the poor was empowered to bring the proceeding and the decision as to whether it should be brought, rested entirely in his discretion. Borawick v. Barba, supra; Kaufman v. Smathers, 111 N.J.L. 52, 56 (E. & A. 1933); Finhandler v. Watts, 7 N.J. Misc. 889 (Juv. Ct. 1929), cert. dismissed 9 N.J. Misc. 1328 (Sup. Ct. 1931); Donnelly v. Passaic Co. Court of Quarter Sessions, 6 N.J. Misc. 247 (Sup. Ct. 1927); Anonymous, 3 N.J.L. 435 ([*]870) (Sup. Ct. 1811). In the Kaufman case, the mother instituted the proceedings in her name and the Court of Errors and Appeals set aside a weekly support order which followed the finding of paternity. The court said:
"We have been unable to find any procedure which may be brought by the woman in a civil action against the father of her bastard child which would enable any court or magistrate to make an order requiring the father to pay a weekly sum to the county probation officer. The county probation officer would not be required to use this fund for the support of such child unless such child became a county charge. The entire theory of the act is that the municipalities of the county shall be protected against *395 the cost of maintaining the bastard child and for this reason the suit must be brought by the overseer of the poor who has charge of the maintenance of persons who become charges upon the municipality. The act is for the protection of taxpayers and people of the municipality and not for the benefit of the mother as it may become the duty of the municipality to care for the mother during her confinement and to care for and maintain the child if the mother and father fail to provide for and maintain it. It, therefore, seems to us that the court could not obtain jurisdiction of this case unless the action was brought by the overseer of the poor by whom the statute requires the action shall be brought. * * *"
The first impression of this ruling is that it is dispositive of the present case. However, the action was not brought under chapter 153 of the Laws of 1929, which is now the substance of R.S. 9:16-2 and 3, and which forms the basis of our judgment. Further, this act does not appear to have been called to the attention of the court at all nor to have been considered. The inquiry dealt solely with the act entitled "An act for the maintenance of bastard children" (Revision of 1898), cited as 1 Comp. Stat. 1910, p. 184, which is now R.S. 9:17-1 et seq.
It is apparent from the foregoing citations that support could be obtained from the father only when the illegitimate child became or seemed likely to become a public charge, and the action to enforce the statutory liability had to be brought by the overseer of the poor (or later by the director of welfare where such officer existed. See R.S. 9:17-1.1). Thus if the mother was supporting such a child, the law provided no means whereby she could have paternity established or secure all or partial maintenance for it from the father. There being no justification in an enlightened society for the perpetuation of such harsh treatment of the mother, the legislature responded by enacting R.S. 9:16-2, 3 and 4, which was designed to require the father to support or to share in the support of his child.
R.S. 9:16-2 provides:
"A child born out of wedlock shall be entitled to support and education from its father and mother to the same extent as if born in lawful wedlock."
*396 And R.S. 9:16-3 says:
"Proceedings to enforce the obligations imposed by section 9:16-2 of this title may be maintained by one parent against the other, * * *, or, if the child is or is likely to become a public charge, the proceedings may be instituted by the overseer of the poor of the municipality or municipalities where the father and mother, or either of them, reside. In such proceedings consideration shall be given to the age of the child and the ability and financial condition of the parent or parents.
Jurisdiction of proceedings hereunder shall be had by the magistrates or courts exercising jurisdiction in bastardy proceedings pursuant to chapter 17 of this title."
The Juvenile and Domsetic Relations Court of Middlesex County has such jurisdiction. N.J.S. 2A:4-18.
It is obvious that the paternity of the father must be established as a prerequisite to the successful maintenance of an action under R.S. 9:16. Layton v. Cooper, 2 N.J.L. 61 ([*]65) (Sup. Ct. 1806). In the Borawick case, supra, the Supreme Court, speaking of this enactment, said:
"The statute did not go into a determination of paternity; but such a determination is a necessary preliminary to an order upon the father for support and is to be reached by a procedure correlated to that of present chapter 17  the former bastardy act. * * *" (p. 396)
As the result of this language, appellant maintains that before support can be sought, the overseer of the poor or the director of welfare must bring the conventional bastardy action against the father and obtain an order of filiation. Such a contention, if adopted, would deprive the statute of its real value.
As already shown, the representative of the municipality or the county is authorized to act only when the child is or is likely to become a public charge. If neither of these conditions exists, he would not file a complaint against the father. What benefit then would R.S. 9:16 be to a mother who was supporting her child and not seeking public assistance, if she could not bring an action under R.S. 9:17-1 et seq., in her own name, seeking a determination of *397 the issue of fatherhood and support? We cannot believe that the Legislature intended any such limitation on the relief granted to the mother.
Section 4 in our judgment supplies the answer to the problem. R.S. 9:16-4. It provides:
"The remedy given by sections 9:16-2 and 9:16-3 of this title shall be deemed cumulative as to remedies contained in chapter 17 of this title (§ 9:17-1, et seq.)."
To be effective as a remedial measure, this must mean that R.S. 9:16 and 9:17 may be used together so as to permit an unwed mother, whose child is not and will not be a public charge, to bring a bastardy action in her own name against the putative father and in the same proceeding secure an order for support for the child. More specifically, the legislative reference to "cumulative remedies" signifies that when the mother proceeds in her own name, all of the procedural safeguards provided by chapter 17, such as trial by jury (R.S. 9:17-8), shall be preserved to the defendant. And probably this is what the Supreme Court had in mind when it spoke of the need for having paternity determined by a "procedure correlated to that of present chapter 17  the former bastardy act," as a preliminary to any allowance for support.
In the present case, the complaint, although very informal in draftsmanship, seems to be patterned after the old forms used in bastardy cases (Newman, New Jersey Criminal Law and Procedure (2d ed. 1926), p. 1140, Form 119), and it makes specific reference to both statutes relied upon for relief. In any event, no objection was made to the form of the complaint either in the trial court or here. Moreover, the action was tried and determined by a jury and it is not suggested that appellant was deprived in any way of due process.
Under all of the circumstances, the matter was presented properly on the complaint of the mother and the judgment should not be disturbed on that ground.
*398 The final ground charges error in the admission, over objection, of the mother's testimony as to resemblance between the child and Centolanza. On being interrogated on the subject, she answered:
"A. Well, he has the same eyes as Ralph, and the nose and the mouth. Of course, I can see different traits in him that a stranger wouldn't be able to see. When he frowns, he looks a lot like him. And different expressions that he uses, he looks a lot like him.
Q. Anything further that you have?
A. Of course, to me he looks just like him."
The record discloses that appellant appeared at the trial. The child, who was over three years of age at the time, was also present and counsel concedes that he was exhibited to the jury.
Counsel apparently recognizes that it is common practice in New Jersey in these cases to exhibit the child to the jury. However, the contention is that the practice is limited to inspection and that it is improper to admit the mother's opinion, evidence or comments on the matter of resemblance to the putative father. Support for this argument is said to appear in Gaunt v. State, 50 N.J.L. 490 (Sup. Ct. 1888), reversed on other grounds, 52 N.J.L. 178 (E. & A. 1889).
It is apparent from a study of the Supreme Court opinion that testimony as to resemblance was received at the trial and the child was exhibited to the jury as well. Then the defense asked the court to instruct the jury that they must judge resemblance not from their own view but from the oral testimony of the witnesses. The refusal to do so was sustained and the Supreme Court uttered some strongly disparaging words about the value of oral testimony as to resemblance. However, there was no statement that it was entirely incompetent.
The rule in this field is considered at length in Wigmore on Evidence and the author sets forth the general principle which seems to have the support of the greater weight of authority, as follows:
*399 "* * * The sound rule is to admit the fact of similarity of specific traits, however presented, provided the child is in the opinion of the trial Court old enough to possess settled features or other corporeal indications." (Vol. 1, § 166, p. 627.)
The authorities are not uniform as to the competency of opinion evidence of resemblance. (Wigmore, supra; Annotation, 40 A.L.R. 97; 95 A.L.R. 314). However, we need not in this instance undertake a general exposition of the view which should prevail in this jurisdiction. It seems sufficient to say that where the child is in court and has been shown to the jury for inspection purposes, it is proper for the mother in her testimony to comment upon the resemblance by making reference to specific aspects thereof. (40 A.L.R. 110; 95 A.L.R. 315).
One of the objections frequently made to the propriety of exhibiting the child is that the record shows nothing except the fact of inspection, and necessarily on appeal much probative force must be attached to the finding of the jury which had the opportunity of physical observation. Consequently oral comment by the mother as to specific physical characteristics, which is open to cross-examination in the presence of the child and the jury, may aid the trial court and jury and provide some assistance to a reviewing court. Therefore such evidence ought to be received. But general statements of opinion, such as "Of course, I can see different traits in him that a stranger wouldn't be able to see. When he frowns, he looks a lot like him. And different expressions that he uses, he looks a lot like him," should be rejected as without probative force, particularly when the child is in court and available for observation.
In the present case, the testimony of the mother as to the similarity of the physical characteristics was proper. Her general statement as to over all likeness carried no probative force but there was no motion to strike it from the record and in any event we conclude that it does not justify a reversal. R.R. 1:5-3(b).
The judgment is affirmed.