16 A.3d 332

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. KELVIN L. MCLEAN A/K/A KEVIN MCLEAN,
DEFENDANT–APPELLANT.

Argued November 8, 2010—Decided March 31, 2011.

Justice Rivera–Soto, J., concurred in part, dissented in part, and filed opinion.

———

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Pugliese* and *Elizabeth H. Smith,* Designated Counsel, on the briefs).

*Christopher W. Hsieh,* Senior Assistant Prosecutor, argued the cause for respondent (*Camelia M. Valdes,* Passaic County Prosecutor, attorney).

Justice HOENS delivered the opinion of the court.

In this matter, we address the permissible scope of lay opinion testimony in the context of prosecutions involving alleged street-level narcotics transactions. More specifically, we consider whether a police officer, who observed defendant Kelvin McLean engage in behavior that the officer believed was a narcotics transaction, should have been permitted to testify about that belief pursuant to the lay opinion rule. *See N.J.R.E.* 701. Because we conclude that the opinion offered by the officer does not meet the requirements needed to qualify it as a lay opinion, and because we conclude that permitting the officer to testify about his opinion invaded the fact-finding province of the jury, we reverse defendant's conviction and remand for further proceedings.

## I.

The facts relevant to the issue before this Court are drawn from the testimony of the witnesses at defendant's trial. On September 7, 2005, three groups of police officers were involved in an undercover surveillance operation in the City of Paterson. The officers were either performing surveillance or serving as back-up units. Detective Altmann and his partner were leading the surveillance by observing the street from their unmarked vehicle. According to Altmann, he saw an individual, later identified as defendant, engage in two transactions. The first occurred shortly before 11:00 a.m. and began when another person approached defendant. After the two conversed briefly, defendant walked into a parking lot, where Altmann could no longer see him. Defendant returned about a minute later and handed one or more small items to the other person, who gave defendant what Altmann said appeared to be paper money. After the other person walked away, Altmann radioed a description of him to the back-up officers, but they were unable to find him.

The second transaction began about ten minutes later and was similar, with defendant engaging in a brief conversation with a different individual and then walking into the parking lot and out of Altmann's view. Altmann testified that he was concerned that there might be "a possible drug stash" nearby, so he and his partner drove to a new surveillance location from which they could see the parking lot. After they arrived and parked, Altmann saw defendant getting out of the front passenger-side door of a white Mercury Sable which was parked in the lot. Defendant then walked back to the individual with whom he had conversed and Altmann, using binoculars, observed what appeared to him to be an exchange of money for a small item. As with the first transaction, Altmann radioed his back-up unit with a description of the individual he had seen interacting with defendant, but a search for him also proved fruitless.

Shortly thereafter, Altmann contacted the back-up units and told them to move in. Two detectives drove into the parking lot, stopped directly in front of the white Mercury Sable, and approached the front of the car from opposite sides. Detective Sergeant Maher saw defendant in the passenger seat and ordered him to step out of the car. As he did, Detective Formentin, who was on the driver's side, saw a small package on the passenger-side floor that he believed contained heroin. He walked around the car and picked up the package, which turned out to be a bundle of ten glassine envelopes, each stamped "Arrival Killer" in green ink and which later were proved to contain heroin. He then searched the rest of the vehicle and, in the glove compartment, he found a plastic bag containing a substance that laboratory tests confirmed to be crack cocaine. After defendant was arrested, police found twenty dollars on his person and $384, comprised entirely of bills in small denominations, in the vehicle.

### A.

At defendant's trial, Detective Altmann, who had conducted the surveillance, was the State's first witness. Because it is his

testimony that gives rise to the question presented to this Court, we recount it in some detail.

Within the first few minutes of the start of Altmann's testimony, the following exchange took place:

PROSECUTOR: Could you tell us what those observations were?

WITNESS: On that day, September 7th, after Detective Sergeant Bailey and myself set up surveillance of the area of Carroll Street by Governor and Harrison Street over there, we were able to observe an individual later identified as Kevin McLean, engage in two suspected hand-to-hand drug transactions in that area in which he was going into a particular vehicle that was parked on the Harrison Street side of 43–45 Carroll Street. It's a parking lot alongside the building. Which he would go into the front passenger seat of a white Mercury Sable to retrieve his suspected drugs from his suspected drug stash.

Approximately a minute later, the following exchange occurred between the Prosecutor and Altmann:

PROSECUTOR: Now you stated before that you changed your surveillance location and you came around where the triangle is, is that correct?

WITNESS: Yes.

PROSECUTOR: And the reason for doing that was what?

WITNESS: Because we observed Mr. McLean after the first trans—suspected hand-to-hand transaction after speaking with the suspected buyer, he walked into the parking lot area on Harrison Street side of the building going out of our view, returning approximately a minute later and then after the second individual engaged in a conversation with Mr. McLean, he went to the same direction. At that time believing he may have a possible drug stash location in that area, we changed our surveillance location to see if we could see where he was going for his drugs.

PROSECUTOR: Okay. You can sit down, sir. You stated a couple of times that you observed the defendant do two suspected hand-to-hand transactions. What is that?

WITNESS: That—normally what transpires a suspected buyer will engage in a conversation—

DEFENSE COUNSEL: Objection, Judge, as to normally.

WITNESS: I'm sorry?

DEFENSE COUNSEL: He can testify as to what he observed but—

PROSECUTOR: Detective, could you tell us what—

THE COURT: Let me address the objection. Objection sustained.

After another question and answer, the following took place:

PROSECUTOR: Okay. And so by the use of the binoculars, were you able to see what was happening clearly?

WITNESS: I could see what was happening clearly, yes.

PROSECUTOR: Now, in your experience, sir, have you seen that type of conduct before?

WITNESS: Yes.

PROSECUTOR: Okay. And—and—and in your experience, did you at that—well let me—strike that. At that point, did you suspect that this was a hand to hand drug transaction?

DEFENSE COUNSEL: Objection, Judge, as to the question. That's a fact for the jury to decide.

THE COURT: Rephrase your question. Objection sustained.

PROSECUTOR: So based on your own experience sir, and your own training, what did you believe happened at that time?

DEFENSE COUNSEL: Objection, Judge, he's asking for a conclusion, not a fact.

PROSECUTOR: Judge, my response would be that it would go to the reason why he's looking, it's not calling for a conclusion. It's calling for his belief and his suspect—his, you know, his own suspicion that later will or will not be confirmed.

During an extensive colloquy with the court outside of the jury's presence, defendant's counsel continued to argue that it was inappropriate for Altmann to offer testimony about his beliefs or his conclusions, while the prosecutor asserted that the officer could testify based on his experience that he had observed a drug transaction. As part of that debate, the prosecutor argued that *N.J.R.E.* 701, which governs lay opinion testimony, applied and that therefore the officer should be permitted to testify about his belief that he had seen a drug transaction. The court agreed with the prosecutor, overruling defendant's objection, and holding:

THE COURT: You know, I agree with the argument of the State pursuant to [*N.J.R.E.*] 701. It's analogous to the question of whether or not an area is a high crime area. A police officer with experience testifies that based on his experience and the area, having conducted many investigations in the area he concludes that it is a high crime area. I'm going to permit the question.

When, in responding to the prosecutor's next question, the detective referred to defendant by name, defendant's counsel again objected and moved for a mistrial, arguing that the use of defendant's name when responding to a hypothetical violated strict limitations on expert testimony established by this Court in *State v. Odom*, 116 *N.J.* 65, 81–82, 560 *A.*2d 1198 (1989), and in *State v. Summers*, 176 *N.J.* 306, 315, 823 *A.*2d 15 (2003). The court disagreed, reasoning that the question was not a hypothetical and that it was not posed to an expert, and concluding that *Odom* and

*Summers* were therefore inapposite. Again relying on *N.J.R.E.* 701, the court denied defendant's motion for a mistrial.

The State presented two other witnesses at defendant's trial, Detective Formentin, who had observed the package of heroin in the car, and Sergeant Maher, who was in one of the back-up units. After the State rested, defendant testified on his own behalf. He presented a different version of events, testifying that he was standing in front of the apartment building, where he was then living with his aunt, because he had gone outside to play dice with some neighbors and to smoke a cigarette. He said that he was walking back and forth on the sidewalk so that he could answer the phone in his aunt's first floor apartment if it rang. He also testified that he went into the parking lot to take out garbage and to make sure that young people from the neighborhood were not vandalizing anything. He explained that he got into his car to get cigarettes, listen to CDs, and get high. Defendant admitted that the drugs in the car were his, but testified that they were for his personal use and were not for sale. He told the jury that the cash found on his person and in the car was a combination of money his aunt had given him and his winnings in the dice game.

After deliberations, the jury found defendant guilty of third-degree possession of a controlled dangerous substance (cocaine), *N.J.S.A.* 2C:35-10a(1); third-degree possession of a controlled dangerous substance (heroin), *N.J.S.A.* 2C:35-10a(1); third-degree possession of a controlled dangerous substance (heroin) with intent to distribute, *N.J.S.A.* 2C:35-5a(1); and third-degree possession of a controlled dangerous substance (heroin) with intent to distribute within 1000 feet of a school property, *N.J.S.A.* 2C:35-7. He was sentenced on the school zone conviction to an extended term of ten years in prison, with five years of parole ineligibility, and all of the other aspects of his sentence either were imposed to be served concurrently or merged.

### B.

Before the Appellate Division, defendant raised several arguments, only one of which is now before us. In relevant part, he

argued that because Detective Altmann was testifying as a fact witness, he "impermissibly intruded on the jury's fact-finding role by expressing an opinion on guilt." In considering that question, the Appellate Division discussed whether the substance of the detective's testimony related to a subject that called for a duly-qualified expert or whether it was permissible as a lay opinion governed by *N.J.R.E.* 701. The panel concluded that Altmann's testimony that he had witnessed two drug transactions properly fit within the scope of the lay opinion rule because it was "based upon his observations, which were a rational basis for his conclusion that drug transactions had occurred." The panel noted that Altmann merely "report[ed] his perceptions of defendant's conduct while he was being surveilled."

Although relying on the lay opinion rule, the panel also concluded that Altmann's training and knowledge as a police officer permitted him to characterize the activities that he saw as drug transactions. In reaching that conclusion, the Appellate Division cited this Court's guidance, *see State v. Nesbitt,* 185 *N.J.* 504, 516, 888 *A.*2d 472 (2006); *State v. Moore,* 181 *N.J.* 40, 43–44, 853 *A.*2d 903 (2004), for the proposition that a police officer is allowed to "testify as to observations of exchanges of money for small objects which led him to conclude he had witnessed a drug transaction," *Moore, supra,* 181 *N.J.* at 43–44, 853 *A.*2d 903, and that expert testimony is not necessary in such situations, *see Nesbitt, supra,* 185 *N.J.* at 516, 888 *A.*2d 472. The Appellate Division therefore rejected defendant's argument that the officer's testimony impermissibly invaded the province of the jury and affirmed his conviction and sentence.

This Court granted defendant's petition for certification, 202 *N.J.* 347, 997 *A.*2d 231 (2010), limiting our review to a consideration of whether Altmann's testimony was a permissible lay opinion.

## II.

This appeal arises in the context of a defendant who admitted that all of the drugs found in the vehicle were his and who

therefore stands before this Court correctly found guilty of the two possessory offenses. The challenge he presents in this appeal nonetheless requires us to consider the appropriate roles of expert and lay opinion testimony in the context of transactions involving street sales of illegal drugs. In order to do so, we briefly review the well-established law governing expert testimony, both in general and in prosecutions of this type, along with the principles that govern lay opinion testimony.

## A.

The familiar standards governing expert opinion testimony are found in three separate rules. *See N.J.R.E.* 702, 703, 705. An expert is one who is qualified "by knowledge, skill, experience, training, or education" and who is therefore permitted to offer testimony in the form of an opinion that "will assist the trier of fact to understand the evidence or to determine a fact in issue." *N.J.R.E.* 702. Experts, unlike other witnesses, are permitted to rely on information that would otherwise be hearsay, and to present it to the jury, if others in their field of expertise reasonably and customarily do so. *N.J.R.E.* 703; *see N.J.R.E.* 705 (governing disclosure by experts and manner of questioning of experts).

Many of this Court's published decisions relating to experts are of rather general application, addressing questions such as the required qualifications of experts, *see, e.g., State v. Townsend,* 186 *N.J.* 473, 495, 897 *A.*2d 316 (2006) (holding that clinical experience counseling battered women alone suffices); *State v. Jamerson,* 153 *N.J.* 318, 337, 708 *A.*2d 1183 (1998) (noting witness was qualified as expert forensic pathologist), and the state of scientific discourse needed to permit such testimony at all, *see, e.g., State v. J.Q.,* 130 *N.J.* 554, 566–574, 617 *A.*2d 1196 (1993) (permitting expert to testify about behavior allegedly associated with child abuse, as defined by Child Sexual Abuse Accommodation Syndrome); *State v. Kelly,* 97 *N.J.* 178, 210–11, 478 *A.*2d 364 (1984) (discussing scientific acceptability of battered women's syndrome); *cf. State v.*

*Chun,* 194 *N.J.* 54, 91–92, 943 *A.2d* 114 (discussing standard for admitting results of scientific test), *cert. denied,* —— *U.S.* ——, 129 *S.Ct.* 158, 172 *L.Ed.2d* 41 (2008); *Romano v. Kimmelman,* 96 *N.J.* 66, 80, 474 *A.2d* 1 (1984) (same).

We need not engage in a detailed explanation of those precedents because they address fundamental propositions not in dispute in this appeal. Instead, we limit our focus to the more circumscribed universe of decisions that govern the use of experts in prosecutions of alleged dealers of illegal drugs. We do so by reviewing the subject matters that experts are permitted to address and the limits we have imposed on the form in which expert testimony may be presented.

Beginning with this Court's seminal decision in *State v. Odom, supra,* 116 *N.J.* at 67–68, 560 *A.2d* 1198, we have held that because expert opinions in narcotics prosecutions are governed by *N.J.R.E.* 702, such testimony is limited to "relevant subject[s] that [are] beyond the understanding of the average person of ordinary experience, education, and knowledge," *Odom, supra,* 116 *N.J.* at 71, 560 *A.2d* 1198. Applying that analysis in *Odom,* in which defendant was charged with possession of narcotics with intent to distribute, we permitted a detective, who was qualified as an expert, to testify about how to distinguish between drugs that are possessed for distribution and those that are merely destined for personal use. *Id.* at 68, 560 *A.2d* 1198. We did so because we reasoned that jurors ordinarily would not understand the significance of quantities, values, packaging, and properties of illegal drugs, and therefore would not appreciate how those characteristics were relevant to deciding, as a matter of fact, whether the narcotics were possessed for distribution. *Id.* at 76, 560 *A.2d* 1198.

Similarly, this Court has permitted an expert to offer testimony about methods of drug distribution and about the roles played by participants in street-level drug transactions. *See State v. Berry,* 140 *N.J.* 280, 293–95, 301, 658 *A.2d* 702 (1995). Relying on numerous state and federal precedents addressing the permissible

scope of testimony concerning the *modus operandi* of drug dealers, *see id.* at 293–301, 658 *A.*2d 702, we concluded that an expert could testify about matters including the acquisition of drugs in New York City, the comparatively higher street value of those drugs if sold here, the purpose of using plastic bags, and "the reasons why drug dealers use juveniles as 'mules' to carry drugs on their person in the course of transport." *Id.* at 302, 658 *A.*2d 702. We again explained our reasoning by commenting that "expert opinion is admissible if the general subject matter at issue, or its specific application, is one with which an average juror might not be sufficiently familiar, or if the trial court determines that the expert testimony would 'assist the jury in comprehending the evidence and determining issues of fact.' " *Id.* at 292–93, 658 *A.*2d 702 (quoting *Odom, supra,* 116 *N.J.* at 70, 560 *A.*2d 1198).

More recently, we concluded that in the context of a transaction in which defendant did not personally hand over the drugs or accept payment, an expert may be utilized to explain to the jury how his actions fit into the scheme of a "street-level distribution network." *Nesbitt, supra,* 185 *N.J.* at 514–16, 888 *A.*2d 472. The Court explained that, at least when the transaction is not a straightforward exchange of money for drugs between two people, an expert may explain how a "defendant's statements and actions, in combination with [another's] words and actions . . . could be indicative of drug distribution." *Id.* at 515, 888 *A.*2d 472. Like the expert testimony we had earlier permitted, *see, e.g., Odom, supra,* 116 *N.J.* at 76, 560 *A.*2d 1198, the significance of the transactions and the roles played by the participants in *Nesbitt* was sufficiently beyond the common understanding of jurors that it met the requirements that *N.J.R.E.* 702 imposes generally on expert testimony.

Our opinion in *Nesbitt* is especially instructive because of the distinction that we drew between those subjects that are permissible areas of expert testimony and those that are not in the context of narcotics prosecutions. As part of our analysis, we expressed our approval of two Appellate Division decisions that held that

expert testimony was not admissible if the transactions at issue occurred in a straightforward manner. *Nesbitt, supra,* 185 *N.J.* at 516, 888 *A.*2d 472 (citing with approval *State v. Baskerville,* 324 *N.J.Super.* 245, 254–57, 735 *A.*2d 39 (App.Div.1999), and *State v. Singleton,* 326 *N.J.Super.* 351, 354, 741 *A.*2d 168 (App.Div.1999)).

■ The Appellate Division precedents we reviewed arose in prosecutions for distribution in which the ultimate question was whether defendant in fact distributed drugs, and in which the appellate court had prohibited the use of experts to merely repeat the facts and add an opinion on the ultimate issue. *See Singleton, supra,* 326 *N.J.Super.* at 354, 741 *A.*2d 168; *Baskerville, supra,* 324 *N.J.Super.* at 262–63, 735 *A.*2d 39. In *Baskerville,* for example, the appellate panel reasoned that understanding and evaluating the testimony of the arresting officers about defendant's behavior, which involved engaging in brief conversations, walking to a vehicle, reaching under it, retrieving a brown bag, extracting something from the bag and exchanging that item for paper currency, *Baskerville, supra,* 324 *N.J.Super.* at 248–49, 735 *A.*2d 39, was not beyond the ken of the jurors, *id.* at 256–57, 735 *A.*2d 39. Rather, the court concluded that the factual testimony alone was sufficient for the jury to consider and to draw the inference of distribution, making the further comment, in the form of an expert opinion, inappropriate. *Id.* at 262–63, 735 *A.*2d 39; *see also Singleton, supra,* 326 *N.J.Super.* at 354, 741 *A.*2d 168 (reiterating that expert is not permitted to repeat facts about brief conversation followed by exchange of money for item retrieved from defendant's sock and opine that it was "street level distribution"). As the Appellate Division observed, although expert testimony relating to defendant's intent to distribute is permitted, "when the expert offers an opinion that a drug transaction occurred he crosses the line of permissibility and contaminates all related proofs with prejudicial qualities not easily cured." *Singleton, supra,* 326 *N.J.Super.* at 354, 741 *A.*2d 168.

As part of this Court's discussion of the issues raised in *Nesbitt,* we agreed with the Appellate Division's analysis of the limits that

apply to the use of experts in drug prosecutions. We concluded that there was no need for an expert "to explain the straightforward manner in which the transactions at issue [in those cases] took place," because they involved only a defendant who was "observed directly handing something to the alleged purchaser and receiving what appeared to be payment in return." *See Nesbitt, supra,* 185 *N.J.* at 516, 888 *A.*2d 472. We distinguished between those transactions and the one we considered in *Nesbitt,* in which the expert was permitted to explain the role played by defendant who did not personally handle the money or the drugs. *Id.* at 515, 888 *A.*2d 472. The role of an expert, therefore, was confined to subjects of the kind contemplated by *N.J.R.E.* 702, restricting such testimony to those matters relating to narcotics prosecutions that might not fall within the realm of what an average juror would know. *Id.* at 514, 888 *A.*2d 472.

From the outset our decisions have imposed other limitations on the use of experts in drug prosecutions that are consistent with our well-established rulings that experts may not, in the guise of offering opinions, usurp the jury's function by, for example, opining about defendant's guilt or innocence, *see State v. Papasavvas,* 163 *N.J.* 565, 613, 751 *A.*2d 40 (2000), or in a manner that otherwise invades the province of the jury to decide the ultimate question, *see State v. Jamerson,* 153 *N.J.* 318, 340, 708 *A.*2d 1183 (1998) (holding that medical expert's opinion that auto accident deaths were result of reckless driving and therefore were homicides invaded jury's province as finder of ultimate facts). For similar reasons, we have not permitted experts, or others, to opine on the credibility of parties or witnesses. *See, e.g., State v. Vandeweaghe,* 177 *N.J.* 229, 239, 827 *A.*2d 1028 (2003); *Jamerson, supra,* 153 *N.J.* at 341, 708 *A.*2d 1183 (rejecting forensic pathologist's opinion about credibility of eyewitness). We have also cautioned courts to exercise care because "the uncritical acceptance of expert testimony can becloud the issues." *State v. Hackett,* 166 *N.J.* 66, 81, 764 *A.*2d 421 (2001) (concluding that there was no need for expert testimony on whether defendant's act of standing naked in front window had capacity to impair or

debauch morals of young children passing by) (quoting *State v. R.W.*, 104 *N.J.* 14, 30, 514 *A.2d* 1287 (1986)).

In extending these principles to narcotics prosecutions, we have recognized that, unless confined to their proper role, expert opinions may present the risk of undue prejudice to defendants. *Berry, supra,* 140 *N.J.* at 301, 658 *A.2d* 702. We therefore have reminded courts that, when considering a proffered expert opinion, its "admissibility . . . should be tempered by the trial court's heightened awareness that . . . the probative value of such expert testimony might be substantially outweighed by the risk of undue prejudice." *Ibid.* In particular, we commented that the risk of undue prejudice could be "significant if the expert witness is one of the investigating officers and also offers an opinion on an ultimate issue in the case." *Ibid.*

█ We drew the line between what is permitted and what is not with care, explaining that an expert may "characterize[ ] defendant's conduct based on the facts in evidence in light of his specialized knowledge[; and that] the opinion is not objectionable even though it embraces ultimate issues that the jury must decide." *Odom, supra,* 116 *N.J.* at 79, 560 *A.2d* 1198; *see also N.J.R.E.* 704. Although permitting an expert both to offer and to explain his opinion that the drugs were possessed for "distribution," *id.* at 81, 560 *A.2d* 1198, we sounded a cautionary note, making it clear that "an expert's testimony that expresses a direct opinion that defendant is guilty of the crime charged is wholly improper." *Id.* at 77, 560 *A.2d* 1198; *see Summers, supra,* 176 *N.J.* at 314–15, 823 *A.2d* 15.

█ In an effort to reduce the risk that an expert's opinion will cross the line into an impermissible one by directly opining on guilt, this Court also established a framework for expert opinions by requiring the use of a hypothetical question that recites the relevant facts as the basis for the expert's opinion. *Odom, supra,* 116 *N.J.* at 82, 560 *A.2d* 1198. Although we have allowed the use of detailed hypotheticals that mirror the facts of the particular prosecution, *see Summers, supra,* 176 *N.J.* at 315–16, 823 *A.2d* 15,

their use is not unbounded. Rather, we have imposed a number of safeguards relating to hypotheticals, including that defendant's name not be included in the question or answer, that the expert's answer should, "to the extent possible," avoid the precise language of the statute that defines the crime, that the expert should be limited to the facts set forth in the hypothetical, and that the judge should instruct the jury that they are not bound by the expert's opinion because the decision about guilt is theirs alone. *Id.* at 314–15, 823 *A.*2d 15; *Odom, supra,* 116 *N.J.* at 79–83, 560 *A.*2d 1198.

Our review of cases has led us to approach the use of experts in such prosecutions with cautious circumspection and we have made it clear that the rule adopted in *Odom* does not give police experts "carte blanche" to offer opinions through the use of hypothetical questions. *Nesbitt, supra,* 185 *N.J.* at 514, 888 *A.*2d 472 (commenting that "*Odom* does not license the use of a narcotics expert to tell a jury that which is obvious"). Nor, as our Appellate Division has held, is it permissible to use an expert to shore up a police officer's testimony about straightforward, but disputed, facts. *See State v. Boston,* 380 *N.J.Super.* 487, 494, 882 *A.*2d 987 (App.Div.2005).

Likewise, we have prohibited, as inconsistent with the *Odom* rule, an expert from testifying that defendant, the driver of a vehicle that contained drugs, "constructively possessed" those drugs. *State v. Reeds,* 197 *N.J.* 280, 284, 962 *A.*2d 1087 (2009). We reversed defendant's conviction, concluding that the expert's inappropriate use of the phrase "constructive possession," a legal term that "mimicked the language of the statute," violated *Odom*'s directive that experts avoid the "precise terminology, and particularly the legalese, of an applicable criminal statute." *Id.* at 295–97, 962 *A.*2d 1087 (quoting *Odom, supra,* 116 *N.J.* at 82, 560 *A.*2d 1198) (internal quotation marks omitted). Moreover, because there was nothing unusual about defendant's actions and nothing that otherwise required explanation by an expert, the proffered opinion that defendant constructively possessed drugs "en-

croached on the jury's role as ultimate fact-finder." *Id.* at 300, 962 *A.*2d 1087; *see State v. Rosales,* 202 *N.J.* 549, 564, 998 *A.*2d 459 (2010) (rejecting opinion evidence about false confession that "did not contain more insight than an average juror would possess through his or her common knowledge when provided with the same facts").

## B.

■ Lay opinions, which have less frequently been the focus of published decisions, are governed by *Rule* 701, which provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.
>
> [*N.J.R.E.* 701.]

Lay opinion testimony, therefore, when offered either in civil litigation or in criminal prosecutions, can only be admitted if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function.

■ The first requirement of the lay opinion *Rule,* limiting it to the perceptions of the testifying witness, is not unbounded. *N.J.R.E.* 701 is based on our former *Evidence Rule* 56(1), and although the wording is not identical to that predecessor, *compare Evid. R.* 56(1) *with N.J.R.E.* 701, the meaning of the term perception has been imported from the earlier version of the *Rule. See* 1991 Supreme Court Committee Comment to *N.J.R.E.* 701 (noting that "perception" in *N.J.R.E.* 701 retains its *Evid. R.* 1(14) definition as "the acquisition of knowledge through one's own senses"). Although the predecessor *Rule*'s definition of that term was not included in the 1991 revision, as the Supreme Court Committee that proposed the revised *Rule* explained, many of the previously-existing definitions were omitted because the meanings had become self-evident. *See* 1991 Supreme Court Committee Comment to *N.J.R.E.* 101(b) (explaining reasons for decision to omit ten of fourteen original definitions). Those meanings, howev-

er, remain unchanged; perception, as a result, rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing. *See State v. LaBrutto*, 114 *N.J.* 187, 199–200, 553 *A.*2d 335 (1989) (permitting lay opinion based on observation); *accord Estate of Nicolas v. Ocean Plaza Condo. Ass'n.*, 388 *N.J.Super.* 571, 582, 909 *A.*2d 1144 (App.Div.2006) (concluding that, for purposes of tolling of statute of limitations based on insanity, son's perception of his mother's cognitive faculties, based on his observations and interactions with her, was permissible lay opinion).

Traditional examples of permissible lay opinions include the speed at which a vehicle was traveling, *State v. Locurto*, 157 *N.J.* 463, 471–72, 724 *A.*2d 234 (1999) (permitting lay opinion about speed of vehicle based upon observation); *Pierson v. Frederickson*, 102 *N.J.Super.* 156, 161–63, 245 *A.*2d 524 (App.Div.1968) (permitting lay opinion about speed of vehicle based upon auditory perception); the distance of a vehicle from the intersection where an accident occurred, *State v. Haskins*, 131 *N.J.* 643, 649, 622 *A.*2d 867 (1993) (listing traditionally permitted subjects of lay opinion testimony); signs and behaviors indicative of an individual's intoxication, *State v. Guerrido*, 60 *N.J.Super.* 505, 509–11, 159 *A.*2d 448 (App.Div.1960) (holding that lay witness opinion was sufficient evidence of intoxication); *Searles v. Public Serv. Ry. Co.*, 100 *N.J.L.* 222, 223, 126 *A.* 465 (Sup.Ct.1924) ("[T]he rule is settled that the average witness of ordinary intelligence may testify whether a certain person was sober or otherwise, without making it appear that the witness was an expert in judging of intoxication."); *see also State v. Bealor*, 187 *N.J.* 574, 588–89, 902 *A.*2d 226 (2006) (permitting police officer to testify about observations of defendant's behavior indicative of narcotics intoxication, but noting preference for expert chemical proofs), and, with an appropriate foundation, the value of personal property owned by the witness, *see Penbara v. Straczynski*, 347 *N.J.Super.* 155, 162, 789 *A.*2d 134 (App.Div.2002) (permitting landlord to testify about value of carpet damaged by tenant seeking return of security deposit); *Lane v. Oil Delivery, Inc.*, 216 *N.J.Super.* 413, 420, 524 *A.*2d 405

(App.Div.1987) (requiring that estimate not be speculative); *State v. Romero*, 95 *N.J.Super.* 482, 487, 231 *A.2d* 830 (App.Div.1967) (permitting owner to testify about value of personal property as part of criminal prosecution for larceny).

■ The second requirement of the lay opinion *Rule* is that it is limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue. Thus, for example, a lay witness was permitted to offer an opinion about the meaning of street slang that defendant used during a conversation relating to a crime because it was "unfamiliar to the average juror, ... [it] was of assistance in determining the meaning and context of his conversation with defendant and was obviously relevant to the issue of defendant's motive and intention." *State v. Johnson*, 309 *N.J.Super.* 237, 263, 706 *A.2d* 1160 (App.Div.), *certif. denied*, 156 *N.J.* 387, 718 *A.2d* 1216 (1998).

To be sure, there are a number of published decisions that might appear to blur the otherwise clear line between lay and expert opinions that have arisen in limited circumstances. As an example, this Court has permitted an individual who had been qualified as an expert in one field to offer an opinion on a subject outside of that field of expertise as a lay opinion. *See State v. Johnson*, 120 *N.J.* 263, 293–95, 576 *A.2d* 834 (1990) (authorizing fingerprint expert to testify about comparison of defendant's footwear with shoeprints left at crime scene). We did so, however, because the lay opinion was one which required no expert qualifications, making the conceded field of expertise irrelevant. *Id.* at 294, 576 *A.2d* 834 (quoting with approval rationale offered by the appellate courts of Maryland and Ohio that "shoeprint patterns are often 'readily recognizable and well within the capabilities of a lay witness to observe. No detailed measurements, no subtle analysis or scientific determination is needed.'") (quoting *Hutt v. State*, 70 *Md.App.* 711, 523 *A.2d* 643, 645–46 (1987) (quoting *State v. Hairston*, 60 *Ohio App.*2d 220, 396 *N.E.*2d 773, 775 (1977))).

Similarly, this Court permitted a police officer to offer a lay opinion about the point of impact between vehicles driven by defendant and decedent, even though they had come to rest before the officer arrived on the scene, *see LaBrutto, supra,* 114 *N.J.* at 197–99, 553 *A.*2d 335, and our appellate court has allowed an officer's testimony, when relevant, about whether a neighborhood is a "high crime area" as a lay opinion, *see Trentacost v. Brussel,* 164 *N.J.Super.* 9, 19–20, 395 *A.*2d 540 (App.Div.1978), *aff'd,* 82 *N.J.* 214, 412 *A.*2d 436 (1980). In each such instance, however, the lay opinion testimony was based on, and supported by testimony about, the officer's personal perception and observation. *See, e.g., LaBrutto, supra,* 114 *N.J.* at 197–98, 553 *A.*2d 335 (noting officer's lay opinion testimony was based on his personal observations of accident scene, areas of damage to vehicles, skid marks and damage to grassy shoulder); *Trentacost, supra,* 164 *N.J.Super.* at 20, 395 *A.*2d 540 (commenting that officer's lay opinion about high crime neighborhood rested on frequency with which he answered calls, quelled disturbances and made arrests in area). Although our appellate court, in explaining such lay opinion testimony, has referred as well to the officer's training and experience, *see, e.g., Trentacost, supra,* 164 *N.J.Super.* at 19, 395 *A.*2d 540, the analysis of admissibility has been, as it must be, firmly rooted in the personal observations and perceptions of the lay witness in the traditional meaning of the *Rule* 701.

 There are, however, limits that have traditionally been imposed on lay opinion testimony. The *Rule* does not permit a witness to offer a lay opinion on a matter "not within [the witness's] direct ken . . . and as to which the jury is as competent as he to form a conclusion[.]" *Brindley v. Firemen's Ins. Co.,* 35 *N.J.Super.* 1, 8, 113 *A.*2d 53 (App.Div.1955) (rejecting "mere conclusions of various witnesses" who opined about cause of storm damage based on their view of aftermath alone); *see Hall v. Centolanza,* 28 *N.J.Super.* 391, 398–99, 101 *A.*2d 44 (App.Div.1953) (rejecting opinion about physical resemblance offered by child's mother in paternity suit when jury had opportunity to view child).

Moreover, unlike expert opinions, lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay. *See N.J.R.E.* 703 (authorizing experts to rely on hearsay of the type and kind ordinarily relied upon by others in their field of expertise).

### III.

Through these precedents, we have established the boundary line that separates factual testimony by police officers from permissible expert opinion testimony. On one side of that line is fact testimony, through which an officer is permitted to set forth what he or she perceived through one or more of the senses. *See, e.g., Nesbitt, supra,* 185 *N.J.* at 516, 888 *A.*2d 472; *Baskerville, supra,* 324 *N.J.Super.* at 254–57, 735 *A.*2d 39. Fact testimony has always consisted of a description of what the officer did and saw, including, for example, that defendant stood on a corner, engaged in a brief conversation, looked around, reached into a bag, handed another person an item, accepted paper currency in exchange, threw the bag aside as the officer approached, and that the officer found drugs in the bag. *See Nesbitt, supra,* 185 *N.J.* at 516, 888 *A.*2d 472. Testimony of that type includes no opinion, lay or expert, and does not convey information about what the officer "believed," "thought" or "suspected," but instead is an ordinary fact-based recitation by a witness with first-hand knowledge. In *Nesbitt,* we concluded that such testimony sets forth facts that are not so outside the ken of jurors that they need an expert to spell out for them whether that defendant engaged in a criminal transaction and that offering an expert in those circumstances would be improper. *Id.* at 514–15, 888 *A.*2d 472.

On the other side of the line, we have permitted experts, with appropriate qualifications, to explain the implications of observed behaviors that would otherwise fall outside the understanding of ordinary people on the jury. *See, e.g., Berry, supra,* 140 *N.J.* at 293–95, 658 *A.*2d 702; *Odom, supra,* 116 *N.J.* at 76, 560 *A.*2d 1198. Therefore, an expert may explain the roles played

by multiple defendants in a drug distribution scheme and may offer an opinion about the implications of the behavior that was observed by the fact witness. *See Nesbitt, supra,* 185 *N.J.* at 515, 888 *A.*2d 472; Berry, *supra,* 140 *N.J.* at 302–04, 658 *A.*2d 702. Similarly, an expert may explain the significance of quantities of narcotics or its distinctive packaging, which are matters that would not otherwise be known by an average juror. *See Odom, supra,* 116 *N.J.* at 76, 560 *A.*2d 1198.

In this appeal, the State suggests, and the appellate panel agreed, that there is a category of testimony that lies between those two spheres, governed by the lay opinion rule, that authorizes a police officer, after giving a factual recitation, to testify about a belief that the transaction he or she saw was a narcotics sale. We do not agree. Were we to adopt that approach, we would be transforming testimony about an individual's observation of a series of events, the significance of which we have previously held does not fall outside the ken of the jury, *see Nesbitt, supra,* 185 *N.J.* at 514–15, 888 *A.*2d 472, into an opportunity for police officers to offer opinions on defendants' guilt. To permit the lay opinion rule to operate in that fashion would be to authorize every arresting officer to opine on guilt in every case.

Our decisions describing the permitted realm of expert testimony in narcotics prosecutions are careful to caution that experts may not intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out without expert assistance and that expert opinions may not be used to express a view on the ultimate question of guilt or innocence. *See Reeds, supra,* 197 *N.J.* at 300, 962 *A.*2d 1087; *Odom, supra,* 116 *N.J.* at 80, 560 *A.*2d 1198. Applying those clear rules to the testimony in this matter, we cannot escape the conclusion that were we to authorize the testimony challenged in this appeal, we would allow, as a lay opinion, testimony that we have found is otherwise impermissible.

The record before the Court in this appeal aptly illustrates the reasons why we reach our conclusion. First, the police officer in

this matter was not qualified to testify as an expert. As a result, the reference in the question to his training and experience, coupled with the request that he testify about his belief as to what had happened, impermissibly asked for an expert opinion from a witness who had not been qualified to give one. Even had he been qualified as an expert, he would not have been permitted to offer testimony about what he thought he had seen because he identified defendant by name in violation of the commands of *Odom, supra,* 116 *N.J.* at 82, 560 *A.*2d 1198, and, as we made clear in *Nesbitt, supra,* 185 *N.J.* at 514–16, 888 *A.*2d 472, the implications of what he said he saw were not outside the common understanding of the jurors.

Second, in turning to the lay opinion rule as a possible basis for permitting the testimony, the appellate panel overlooked the inherent flaw in that approach. That is, in agreeing with the trial court that the testimony qualified as a lay opinion, the appellate panel recognized that this Court has precluded expert testimony on this subject because it is not outside the ken of average jurors, *see Nesbitt, supra,* 185 *N.J.* at 516, 888 *A.*2d 472, but reasoned instead that an officer may give the opinion based on this Court's analysis in *Moore, supra,* 181 *N.J.* at 43–46, 853 *A.*2d 903.

That analysis was faulty in two respects. First, the issue in *Moore* was whether, in the context of a pretrial motion to suppress, an officer's opinion that he had observed a drug transaction provided probable cause for him to move in and make an arrest. *Id.* at 47, 853 *A.*2d 903. This Court, in concluding that it did, did not suggest that the officer would have been permitted to offer that opinion to the jury as a lay opinion under *N.J.R.E.* 701. Second, by relying on *Moore,* the court overlooked the fact that testimony in the form of an opinion, whether offered by a lay or an expert witness, is only permitted if it will assist the jury in performing its function. Opinion testimony of either sort is not a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself or an opportunity to express a view on guilt or innocence. The opinion that we agreed would be

impermissible when offered by an expert in *Nesbitt* cannot be transformed into a permitted one when offered by a lay witness; neither proffered opinion meets the test of providing the jury with information beyond their ordinary ken.

In short, the testimony of the police detective, because it was elicited by a question that referred to the officer's training, education and experience, in actuality called for an impermissible expert opinion. To the extent that it might have been offered as a lay opinion, it was impermissible both because it was an expression of a belief in defendant's guilt and because it presumed to give an opinion on matters that were not beyond the understanding of the jury. In the final analysis, the approach taken to this testimony by the trial court and the Appellate Division would effectively authorize an officer both to describe the facts about what he or she observed and to opine in ways that we have precluded previously. We decline to permit the lay opinion rule to be so utilized.

## IV.

The judgment of the Appellate Division is affirmed in part and reversed in part. In light of defendant's admission under oath that the heroin and the cocaine were his, his convictions for the two possessory offenses are affirmed and the matter is remanded for a new trial on the charges of third-degree possession of a controlled dangerous substance (heroin) with intent to distribute, *N.J.S.A.* 2C:35-5a(1); and third-degree possession of a controlled dangerous substance (heroin) with intent to distribute within 1000 feet of a school property, *N.J.S.A.* 2C:35-7.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

Concluding that testimony proffered by a police officer describing a drug transaction he witnessed constituted opinion testimony did "not meet the requirements needed to qualify it as a lay opinion, and because ... permitting the officer to testify about his

opinion invaded the fact-finding province of the jury," *ante* at 443, 16 *A.*3d at 335, the majority reverses that part of the judgment of the Appellate Division that affirmed defendant's convictions and sentence for the third-degree possession of heroin with the intent to distribute, in violation of *N.J.S.A.* 2C:35-5(a)(1), and the third-degree possession of heroin with the intent to distribute within 1,000 feet of school property, in violation of *N.J.S.A.* 2C:35-7. *Ante* at 463, 16 *A.*3d at 347.[1] To the extent the majority reverses the judgment of the Appellate Division, I must respectfully dissent: the reasoning employed by the Appellate Division in ruling that the challenged testimony was admissible as a proper lay opinion is unassailable.

In point/counter-point fashion, the Appellate Division set forth the position of the parties plainly and concisely:

> Defendant asserts initially that because the State did not qualify Altmann as an expert, he should not have been permitted to testify as to his opinion that he had witnessed two drug transactions. The State counters by asserting that Altmann's testimony was properly elicited as a permissible lay opinion pursuant to *N.J.R.E.* 701, which did not require qualification of the witness as an expert. Defendant maintains that because neither suspected purchaser was ever located, and there was no evidence other than the officer's word, Altmann's opinion cannot be considered a lay opinion, as he had no actual knowledge that a drug transaction took place.

After citing to the lay opinion evidence rule, *N.J.R.E.* 701, the panel noted that "Altmann's testimony concerning both transactions was based upon his observations, which were a rational basis for his conclusion that drug transactions had occurred." (citation omitted). It reasoned that, "[c]ontrary to defendant's contention, Altmann did not offer any testimony regarding defendant's guilt." It explained that Altmann was "not testifying as an expert; rather, he was testifying as a fact witness reporting his perceptions of defendant's conduct while he was being surveilled." Its rationale was straightforward: "Because of his specialized knowl-

---

[1] The majority, however, affirms defendant's convictions and sentence for the third-degree possession of cocaine, in violation of *N.J.S.A.* 2C:35-10(a)(1), and the third-degree possession of heroin, also in violation of *N.J.S.A.* 2C:35-10(a)(1). *Ante* at 463, 16 *A.*3d at 347. I concur with those conclusions.

edge and depth of experience as a police officer, [Altmann] was entitled to characterize his perceptions in that manner." Invoking this Court's own precedent, it observed that "an expert is not necessary to explain transactions such as the ones observed here, in which 'each defendant was observed directly handing something to the alleged purchaser and receiving what appeared to be payment in return.'" (quoting *State v. Nesbitt*, 185 *N.J.* 504, 516, 888 *A.*2d 472 (2006)). It therefore declared itself "satisfied that Altmann's testimony concerning his belief about the occurrences he had perceived was properly admitted as a lay opinion and did not amount to error. It did not usurp the jury's function to determine guilt."

In the context of this garden-variety drug prosecution, there is nothing remarkable in the Appellate Division's reasoning and resulting conclusion. Therefore, to the extent the majority reverses the Appellate Division's judgment and, in doing so, departs from the commonsense and now well-established notions that infuse the Appellate Division's affirmance of defendant's convictions for the possession of heroin with the intent to distribute and for that same possession with intent to distribute within a school zone, I respectfully dissent.

*For affirmance in part; reversal in part; remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, HOENS, and Judge STERN (temporarily assigned)—6.

*For concurrence in part; dissent in part*—Justice RIVERA-SOTO—1.