**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0060-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DANTE C. ALLEN,

    Defendant-Appellant.

_____

Submitted November 4, 2021 – Decided January 24, 2022

Before Judges Alvarez and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 16-02-0379.

Joseph E. Krakora, Public Defender, attorney for appellant (Glenn D. Kassman, Designated Counsel, on the briefs).

Lori Linskey, Acting Monmouth County Prosecutor, attorney for respondent (Monica do Outeiro, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Tried by a jury, defendant Dante C. Allen was convicted of first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and third-degree unlawful possession of a controlled dangerous substance (CDS), N.J.S.A. 2C:35-10(a)(1). The jury acquitted defendant of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), and fourth-degree possession of a prohibited weapon or device, hollow-nose bullets, N.J.S.A. 2C:39-3(f). Prior to trial, the State moved to dismiss a fifth count, third-degree receiving stolen property, N.J.S.A. 2C:20-7(a). On July 19, 2019, the trial judge sentenced defendant to concurrent terms: eighteen years' imprisonment subject to eighty-five percent parole ineligibility, N.J.S.A. 2C:43-7.2, on the attempted murder; eight years with a Graves Act term of parole ineligibility of forty-two months, N.J.S.A. 2C:43-6(c), on the weapons offense; and five years on the drug charge. Defendant appeals the convictions and sentence, and we affirm.

The events leading to the indictment, established during the trial, occurred on November 4, 2015. At approximately 7:15 p.m., Asbury Park Police Officer Terrance McGhee was patrolling a high crime area in his marked vehicle, two or three hours after the report of a shooting in the vicinity. No one had yet been arrested for the crime.

A-0060-19

As McGhee stopped at a well-lit intersection, he noticed two men talking. One man, dressed in jeans, looked in McGhee's direction, shook hands with his companion, and walked away while "clutching something" with his left hand underneath his gray hooded sweatshirt. He clenched his left arm tightly to his side while his right arm swung free.

The officer followed the man, later identified as defendant, who made eye contact with him at one point and "stutter-stepped." The officer drove around the block, and when he returned to the intersection, he saw defendant in front of his patrol car, walking very quickly.

McGhee stopped, left his vehicle, and asked defendant if he could speak to him. Defendant immediately told the officer he had his identification, which he removed from his right pocket with his right hand. Holding his wallet up in the air and away from his body, defendant continued to hold his left hand and arm close to his body. Defendant fumbled at the wallet with his right fingers, attempting to remove identification while "blad[ing]" his body away. The officer became concerned for his safety and repeatedly asked defendant to show both hands. When defendant seemed to be reaching in further with his left hand, the officer touched the front of the sweatshirt and felt the outline of a handgun.

3

Defendant slapped the officer's hand away and began to run.  McGhee drew his weapon and gave chase, yelling for defendant to stop.  Defendant continued to run, then turned to the officer, and at a distance of some eighteen to twenty-four feet, pointed a gun at him, fired, and kept going.  The officer fired his gun seven times and struck defendant in the left leg, knocking him to the ground.  As McGhee stood over him, defendant told the officer "let me talk to you man to man.  I f---ed up."

McGhee shone his flashlight around defendant and saw the gun on the ground to the left, within defendant's reach.  McGhee asked the backup officer who had joined him to retrieve it.

While McGhee was on the stand, the prosecutor played video footage from various locations along the path of the officer's initial observation depicting the chase and the shooting.  McGhee identified himself and defendant on the film, along with the muzzle "flash[es]" from the two exchanging fire.

Defendant testified on his own behalf, admitting he had no permit or license for the handgun, claiming he purchased it for his protection because a former girlfriend was dating a gang member who had threatened him.  He also admitted becoming nervous when he saw police and slapping the officer's hand when he reached for his sweatshirt pocket.  He added:

4

A-0060-19

> So as I ran from . . . McG[h]ee, I run, it's kind of lit, and as I continue to run, it gets dark. So I take the gun on my left hand with my mind going, I try to throw the gun on the . . . roof, but as I turned to the side, I could see McG[h]ee out of my peripheral. So next thing on my mind is to bring the gun back in, but it's too late, I wasn't able to, the gun goes off.

He insisted he did not intend to hurt the officer but merely meant to discard the weapon. Defendant further acknowledged he was on probation for a third-degree conspiracy to possess cocaine at the time of this arrest.

Monmouth County Prosecutor's Office Detective Michael Campanella described his investigation, including the collection of surveillance camera footage over the area of the chase and the shooting. He could not locate defendant's spent bullet, despite searching for spent shell casings discharged from both weapons. During the trial, the State played the video recordings of the chase and the shooting a second time while Campanella was on the stand. While the tape was running, he said:

> At this point, I can see the suspect, you can see with the shadow . . . you can see the suspect is beginning to turn, he's entered the field. . . . McG[h]ee is still engaging in pursuit.
>
> . . . .
>
> Okay, so at this point, this is at 56.16 seconds, . . . I see the first muzzle flash, which is this white blip

5

that you're seeing right here.  That's the defendant firing
the handgun.

. . . .

Here, now you see the first muzzle flash you'd
seen from the previous camera angle.  This is where the
suspect has turned and has discharged the first round.

Randolph Toth, a State Police Ballistics Unit expert, testified that a bullet

would discharge from defendant's weapon only upon the application of nine and

three-quarter pounds of force on the trigger.  The gun's internal mechanism

would "not allow the firing pin to move forward unless the trigger is pulled all

the way through" with the requisite force.

Prior to trial, defendant moved to suppress evidence, arguing McGhee's

initial stop was unlawful.  The trial judge denied the motion, finding McGhee a

credible witness.  He further found McGhee initially approached defendant in a

field inquiry for which he did not need "reasonable and articulable" suspicion.

Defendant's peculiar reaction to that field inquiry escalated matters quickly—

his "unnatural way" of "blad[ing]" his body and odd raising of his right arm in

the air with his wallet while continuing to clutch his left arm to his side,

amounted to individualized articulable suspicion that made the officer's gesture

of reaching out to feel the object constitutional.

6

Defendant also appeals his sentence. We describe the judge's analysis of the statutory factors in that section of the opinion.

On appeal, defendant raises the following points for our consideration:

POINT I

BY PERMITTING DETECTIVE CAMPANELLA TO NARRATE CRITICAL PORTIONS OF THE SURVEILLANCE VIDEO THAT THE JURORS SHOULD HAVE BEEN LEFT TO INTERPRET FOR THEMSELVES, THE COURT DENIED DEFENDANT A FAIR TRIAL.

POINT II

BECAUSE OFFICER MCGHEE LACKED REASONABLE ARTICULABLE SUSPICION TO JUSTIFY AN INVESTIGATORY STOP, THE EVIDENCE SEIZED FROM DEFENDANT SHOULD HAVE BEEN SUPPRESSED.

POINT III

BECAUSE THE COURT FAILED TO CONSIDER THE DEFENDANT'S YOUTH, THE SENTENCE IT IMPOSED OF [EIGHTEEN] YEARS IN NEW JERSEY STATE PRISON WAS EXCESSIVE.

I.

N.J.R.E. 701 states "[i]f a witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the witness'[s] perception and (b) will assist in

A-0060-19

understanding the witness'[s] testimony or determining a fact in issue." "The central purpose of N.J.R.E. 701 is to ensure that lay opinion is based on a sufficient foundation, and not inadmissible hearsay." Rice v. Miller, 455 N.J. Super. 90, 104 (App. Div. 2018); see also State v. McLean, 205 N.J. 438, 460 (2011) ("[L]ay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay.").

Courts "have established the boundary line that separates factual testimony by police officers from permissible expert opinion testimony." McLean, 205 N.J. at 460. "On one side of that line is fact testimony, through which an officer is permitted to set forth what he or she perceived through one or more of the senses." Ibid. Such fact testimony consists of "a description of what the officer did and saw," and is an "ordinary fact-based recitation by a witness with first-hand knowledge." Ibid. "On the other side of the line, . . . experts, with appropriate qualifications, [can] explain the implications of observed behaviors that would otherwise fall outside the understanding of ordinary people on the jury." Ibid.

In light of these precedents, Campanella's testimony "intrude[d] on the province of the jury by offering, in the guise of opinions, views on the meanings of facts that the jury is fully able to sort out." Id. at 461.

Without first-hand knowledge of the incident, Campanella interpreted the subject matter depicted on the film when the jury could have readily done so itself. Unwittingly, he expressed a view on the ultimate question of guilt or innocence. See ibid. Thus, the judge abused his discretion by letting Campanella narrate the video.

The erroneously admitted testimony, however, could not have led the jury to a verdict it might not have otherwise reached. See State v. Baum, 224 N.J. 147, 159 (2016). In this case, McGhee not only testified about the events captured on tape, but defendant also admitted he fired his weapon, although he claimed he fired accidentally. The State had a strong case.

Furthermore, Toth's testimony with regard to the weight necessary for the gun to discharge damaged defendant's credibility. Thus, Campanella's improper testimony did not lead the jury to an unjust result or prejudice defendant's right to a fair trial.

## II.

Defendant contends the judge committed reversible error by denying the suppression motion. This point lacks merit.

We uphold the factual findings underlying a trial court's decision so long as they are "supported by sufficient credible evidence in the record." State v.

Scriven, 226 N.J. 20, 40 (2016). We reject those findings "only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

"Those findings warrant particular deference when they are 'substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Rockford, 213 N.J. 424, 440 (2013) (alteration in original) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). We review de novo the judge's legal conclusions. State v. Watts, 223 N.J. 503, 516 (2015).

A "field inquiry is essentially a voluntary encounter between the police and a member of the public in which the police ask questions and do not compel an individual to answer." State v. Rosario, 229 N.J. 263, 271 (2017). "The test of a field inquiry is 'whether [a] defendant, under all of the attendant circumstances, reasonably believed he could walk away without answering any of [the officer's] questions.'" Id. at 271-72 (alteration in original) (quoting State v. Maryland, 167 N.J. 471, 483 (2001)). Because the individual is free to leave, field inquiries do not require a well-grounded suspicion of criminal activity. Id. at 272 (citing Elders, 192 N.J. at 246).

A-0060-19

An investigatory stop or detention, sometimes referred to as a Terry[1] stop, "occurs during a police encounter when 'an objectively reasonable person' would feel 'that his or her right to move has been restricted.'" Ibid. (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). Thus, a Terry stop implicates the constitutional requirement that there be "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." Elders, 192 N.J. at 247 (quoting Rodriguez, 172 N.J. at 126). Without reasonable suspicion, evidence discovered during a search conducted during the detention is subject to exclusion. State v. Chisum, 236 N.J. 530, 546 (2019).

To determine whether reasonable suspicion exists, a judge must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. State v. Nelson, 237 N.J. 540, 554-55 (2019) (quoting State v. Stovall, 170 N.J. 346, 361 (2002)). This analysis also considers police officers' "background and training," including their ability to "make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. at 555 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). "'Furtive' movements by [a] defendant,"

_____

[1] Terry v. Ohio, 392 U.S. 1 (1968).

A-0060-19

unaccompanied by other circumstances, "cannot provide reasonable and articulable suspicion to support a detention in the first instance."  Rosario, 229 N.J. at 277 (quoting State v. Lund, 119 N.J. 35, 47 (1990)); see State v. Dunbar, 434 N.J. Super. 522, 527 (App. Div. 2014).

It is clear from the totality of these circumstances that McGhee, whom the judge found to be credible, had a reasonable and articulable suspicion to conduct an investigatory detention and to touch defendant's sweatshirt in a Terry type pat-down—albeit with an element of urgency.  He was patrolling in a high crime area hours after a shooting, knowing no suspect had been arrested.

Defendant's furtive movements included walking some distance while holding one arm clutched tightly to his side after seeing a police officer.  In the context of the earlier events, this peculiar, furtive behavior warranted at least a field inquiry.  Once the officer circled the block and saw defendant walking faster in order to leave the location, the circumstances justified the stop.

Once McGhee spoke to defendant, however, defendant's unusual response in holding his wallet up in the air, trying to remove his identification with his right hand while still clutching his left hand to his side, increased the officer's reasonable suspicion that defendant was hiding a gun.  Defendant's actions turned a field inquiry into an investigatory stop.  McGhee had reasonable and

12

articulable suspicion to conduct the investigatory stop and to reach out and pat the exterior of defendant's sweatshirt. The judge did not err in denying the motion to suppress.

III.

Defendant contends that since his appeal was in the pipeline, the enactment of N.J.S.A. 2C:44-1(b)(14) more than a year after he was sentenced entitles him to a remand for resentence. This issue was recently put to rest. See State v. Bellamy, 468 N.J. Super. 29, 42-48 (App. Div. 2021). There, we held that despite the "ameliorative nature of the new mitigating factor," the statute was:

> not intended to mean cases in the pipeline in which a youthful defendant was sentenced before October 19, 2020, are automatically entitled to . . . reconsideration based on the enactment of this statute alone. Rather, it means where, for a reason unrelated to the adoption of the statute, a youthful defendant is resentenced, he or she is entitled to argue the new statute applies.
>
> [Id. at 48.]

Defendant had an extensive juvenile history beginning at age fourteen, which included weapons possession, robberies, and acts of violence. At the time this incident occurred, he was only twenty, having been placed on probation for his first adult conviction a mere two weeks before this incident.

13

Defense counsel vigorously argued for the minimum sentence available in the statutory range, but the judge found aggravating factor three, N.J.S.A. 2C:44-1(a)(3), the risk that defendant would commit another offense, describing the risk as "high," aggravating factor six, N.J.S.A. 2C:44-1(a)(6), the extent of his prior criminal history, as well as aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), the need to deter this defendant and others from violating the law. The judge found aggravating factor nine particularly salient here, as defendant's shot could have struck the officer or a bystander. The judge found none of the mitigating factors urged by defense counsel.

Although we may not agree that eighteen years was appropriate in this case, we do not consider the matter as if we were sentencing defendant anew. The term of years does not shock our conscience. See State v. Roth, 95 N.J. 334, 364 (1984). To the contrary, we review a trial judge's sentencing decision under an abuse of discretion standard. See State v. Fuentes, 217 N.J. 57, 70-71 (2014). We do not substitute our judgment for that of the sentencing court. Ibid. The judge's findings of aggravating factors, and the absence of mitigating factors, were supported by competent credible evidence. See State v. Bieniek, 200 N.J. 601, 608 (2010). In light of the judge's analysis, no abuse of discretion occurred.

A-0060-19

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0060-19